**Maria NIEVES, Plaintiff**

v.

**INDIVIDUALIZED SHIRTS,
et al., Defendants.**

**Civil No. 95–5411(WHW).**

United States District Court,
D. New Jersey.

April 28, 1997.

Stephen C. Arber, Jil Gropper, Cohn Bracaglia & Gropper, Somerville, NJ, for Plaintiff.

Margaret Lambe–Jurow, Podvey, Sachs, Meanor, Catenacci, Hilner & Cocoziello, Newark, NJ, for Defendants.

## AMENDED OPINION

WALLS, District Judge.

Defendants, Individualized Shirts and its parent company, Tom James of America, Inc. (collectively, "defendants" or "Individualized Shirts"), move for summary judgment on the complaint of plaintiff Maria Nieves ("Nieves"). Nieves cross moves for summary judgment. On February 24, 1997, the Court heard oral argument from counsel for both parties. For the reasons stated below, the Court grants in part and denies in part the motion of the defendants, and denies the cross motion of the plaintiff.

### I. *Factual Backgroud*

Individualized Shirts operates a custom shirt factory in Perth Amboy, New Jersey. All non-managerial employees are members of the Amalgamated Clothing and Textile Workers' Union ("the union"). Nieves was represented by the union the entire time she worked for the defendants and had no employment contract other than the collective bargaining agreement ("the CBA") between the union and defendants.

Nieves began working at Individualized Shirts in August 1981 as a cuff cutter, a job that required her to stand all day. According to Individualized Shirts, a standing position gives the worker the needed leverage on

the short knife used for the cutting function of the job.

The plaintiff averaged approximately $8.50 per hour and worked forty hours per week. She resigned from the employment in April 1987, returned in August 1991, and resigned again in September 1991, telling her supervisor that her varicose veins caused her pain and negatively affected the amount of time she could remain standing.

After she resigned in September 1991, Nieves took a part-time position as a teacher's aide, which allowed her to sit down for part of the work day. She then separated from her husband and needed a full time job in order to support her family. In late December 1992, Nieves called her former supervisor at Individualized Shirts to ask if there were any positions available. According to Nieves, she informed that person that any position would have to be one which permitted her to sit while working.

Individualized Shirts states that it offered Nieves a position in the computer room performing data entry with the understanding that she would also work as a cuff cutter. She returned to work in the computer room from January to July 1993 until she was transferred to a cuff cutter position. Dissatisfied with the transfer, plaintiff asked her supervisor to remain in data entry. According to Nieves, the supervisor advised that if she worked as a cuff cutter for part of the day, she would be able to work at data entry for the rest of the time. Although plaintiff consented to the arrangement, Individualized Shirts never attempted this "half and half" schedule and she was required to stand all day as a cuff cutter. Nieves was informed that no accommodation could be made for her.

So Nieves worked as a cuff cutter from July 1993 to April 1994, when she took maternity leave. She returned to work in June 1994 with a doctor's note stating that due to her varicose veins she could not stand for more than three consecutive hours. Nieves sought and was granted medical leave to have corrective surgery to her varicose veins.

Individualized Shirts held open her cuff cutter job until she was ready to return in October 1994. She returned with a doctor's note stating that she needed light duty work with no prolonged standing. At that time, the full complement of three union employees was working in the computer room. Because the CBA did not provide for factory wide seniority rights, Individualized Shirts could not lay off one of the computer room employees to substitute Nieves. Nor did Individualized Shirts have any light duty positions available to her. Consequently, Nieves' employment was terminated by Individualized Shirts.

Plaintiff collected unemployment benefits from October 1994 to April 1995. In September 1995, she started working as a bus driver for 26½ hours a week. Nieves testified that following her discharge, "[she] was depressed, [her] kids were affected, [her] daughter had problems in school because of [her] ... anger, frustration, financial—[her] credit was ruined." Nieves Dep. at 84:25—85:4. She expressed her frustration and concern over being the "sole supporter" of her children, stating,

There were times they needed clothing, you know, things ... for school ... I mean, sometimes I couldn't dress them nicely. [T]hey would get teased by other kids, and my daughter was retained to the same grade. I believe it had to do with what I was going through.

She also indicated that her ex-husband was behind on his obligations to pay child support, which added to her difficulties. Id. at 91:14–18.

The CBA in effect during the time Nieves was last employed at Individualized Shirts provided the following:

### LEAVE OF ABSENCE

... An employee on leave of absence shall be reinstated to his or her previous job, operation or machine upon return to work.

### CIVIL RIGHTS

1. The Employer and the Union shall not discriminate nor perpetuate the effects of past discrimination, if any, against any employee or the applicants for employment on account of race, color, religion, creed, sex,

or national origin. This clause shall be interpreted broadly to be co-extensive with all federal, state or local anti-discrimination laws and where available, judicial interpretation thereof.

\* \* \* \* \* \*

If, upon failure to mutually agree [upon such steps as are necessary to achieve compliance], either party invokes the arbitration procedures of this agreement to resolve the dispute, the Impartial Chairman shall fashion his award to grant any and all relief appropriate to effectuate this article.

### ARBITRATION

A. Grievances and Arbitration, initiated by the Union, the Employer, or an employee through the Union, shall be the sole means of settling disputes which may arise between the parties.

B. Any complaint, grievance or dispute *arising out of or relating directly or indirectly to the provisions of this agreement or the interpretation or performance thereof,* shall in the first instance be taken up for adjustment between the representatives of the Union and the Employer and, if they are unable to adjust the same, the matter shall be referred for arbitration and determination to ... the Impartial Chairman under this agreement[.] [emphasis added]

\* \* \* \* \* \*

K. The procedure established in this agreement for the adjustment of disputes shall be the exclusive means for the determination of such disputes, including strikes, stoppages, lockouts and any and all claims, demands, and acts arising therefore, except as expressly provided otherwise in this agreement. No proceeding or action in a court of law or equity shall be initiated other than to compel arbitration or to enforce awards. This Paragraph shall constitute a complete defense and ground for a stay of any action or proceedings instituted contrary thereto.

Nieves neither signed nor was provided with a copy of the CBA. She never filed a grievance with the company.

On May 2, 1996, Nieves related at her deposition:

Q: Do you still suffer from the same disability that you suffered from in October of 1994?

A: Somewhat, I still get swelling, occasional pain if I'm standing for a long time.

Q: Are there any restrictions on your activities now?

A: Not necessarily, only doctor's orders, you know, that I have to elevate my legs a few hours of the day, which I do, and I wear the stockings if I'm going to do a lot of standing, that's it.

Q: You only have to wear the stockings if you're going to be standing for a long time?

A: Sometimes. It depends. Sometimes I have to wear them even if I'm not standing, even at home if I'm standing doing something, you know. I put them on because I do feel like the surgery, from the incision, sometimes I get a little throbbing in there.

Nieves Dep. at 60:145—61:4.

In a report dated July 19, 1996, the plaintiffs expert, Dr. Malcolm H. Hermele, noted that Nieves complained of "difficulty squatting and kneeling or standing for more than 30 minutes because of pain and fatigue in her legs." She has difficulty walking in malls and exercising, "feels confined [because] her legs fatigue easily," suffers from sleep disruption, and leg spasms and throbbing knees. Based upon these complaints, Dr. Hermele opined that Nieves "has a physical disability that substantially limits her in major life activities such as walking, standing for prolonged periods of time, significant decrease in ability to shop; it interferes with her sleep pattern and sexual activity, difficulty squatting and kneeling and has limited her ability to find adequate employment." Dr. Hermele states that her disabilities are substantial and likely to be permanent.

Nieves also submits the expert witness report of Robert John Anders, an industrial design consultant. Anders states that the defendants could reconfigure Nieves' work

station to accommodate her need to work while seated. According to him, such modifications would cost less than $500.00.

In regard to this motion, the defendants have presented the expert witness report of Sylvano Anthony Tagnani, who holds a degree in industrial engineering and is a consultant to shirt making firms such as Individualized Shirts. His report asserted that the use of a short knife to cut fabric while one is sitting is both less safe and less efficient than its use when one is standing. The report incorporates the comments of textile workers who engage in short knife cutting. The defendants also state that the accommodation of a person who must remain seated would require the redesign of the entire work area. Moreover, they argue that productivity would decline and the employee who remained seated would earn less money as a result.

## II. Procedural History.

Nieves filed complaints against the defendants with the New Jersey Division on Civil Rights ("NJDCR") and the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued an administrative ruling of no probable cause with regard to her claims and gave her a right to sue letter. She brings this action against the defendants, alleging, among other things, violations of the Americans With Disabilities Act (ADA) of 1990, 42 U.S.C.A. § 12101 *et seq.*, the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5–1 *et seq.*, and intentional infliction of emotional distress.[1]

## III. Standard of Review

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex v. Catrett* 477 U.S. 317, 327,

106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). The material fact or facts become genuine when a reasonable trier of fact could render a verdict for the non-moving party. *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *Meyer v. Riegel Prod. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

## IV. Legal Analysis

The defendants make the following arguments in support of their motion for summary judgment: (1) Nieves, a unionized employee, must use the contract grievance procedures in the CBA before filing an action in federal court; (2) agreements to arbitrate any complaint, grievance or dispute, including a statutory claim under the ADA, may be enforced under a collective bargaining agreement; (3) Nieves has failed to establish a prima facie case for a claim of in-

---

1. Nieves voluntarily dismissed claims of breach of contract, breach of quasi-contract, and breach of implied contract of employment.

tentional infliction of emotional distress; and (4) summary judgment must be granted dismissing Nieves' discrimination claims because she cannot establish that her condition was a "handicap" preventing a bodily or mental function. Nieves contends that she is entitled to summary judgment on her claims.

A. *Whether Nieves' Suit Must Be Dismissed Because She Was Required to Use the Contract Grievance Procedures in the CBA And/Or Submit Her Claims to Arbitration.*

The defendants argue that Nieves' complaint should be dismissed because she failed to exhaust her administrative remedies by using the grievance and complaint procedures in the CBA. At all times during her employment Nieves was a member of the union. The CBA in effect between her union and the defendants required her to bring any "complaint, grievance or dispute" for adjustment between members of the union and the employer. If those efforts failed, the matter would be referred to arbitration.

An analysis of this issue must begin with the unanimous decision of the Supreme Court in *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). There, plaintiff Alexander, an African–American union member, employed pursuant to a collective bargaining agreement between his union and the defendant company, was discharged from his job. The collective bargaining agreement prohibited "discrimination against any employee on account of race, color, religion, sex, national origin, or ancestry" and further stated that "[n]o employee will be discharged ... except for just cause." *Id.* at 39, 94 S.Ct. at 1015. Disputes were to be submitted to a multistep grievance procedure; if the procedure failed, the matter would be submitted to arbitration. *Id.* The collective bargaining agreement further provided that the arbitrator's decision "must be based solely upon an interpretation of the provisions of this Agreement." *Id.* at 42, 94 S.Ct. at 1016. Alexander filed a grievance and in the final, pre-arbitration step, he raised for the first time a claim of racial discrimination. *Id.* at 42, 94 S.Ct. at 1016–

17. The company rejected his claims and the matter went to arbitration. Before the arbitration hearing, Alexander filed a charge of racial discrimination with the Colorado Civil Rights Commission, which referred the matter to the EEOC. The arbitrator ruled against Alexander, finding that he was discharged for just cause.

Alexander received a right to sue letter from the EEOC and filed a complaint in federal court alleging that his discharge was racially motivated and violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The district court, affirmed by the Court of Appeals for the Tenth Circuit, dismissed the action, holding that "[the] petitioner, having voluntarily elected to pursue his grievance to final arbitration under the nondiscrimination clause of the collective-bargaining agreement, was bound by the arbitral decision and thereby precluded from suing his employer under Title VII." *Id.* at 43, 94 S.Ct. at 1017.

The Supreme Court reversed, holding that the federal policy favoring arbitration does not establish that an arbitrator's resolution of a contractual claim precludes a statutory claim under Title VII. *Id.* at 47–49, 94 S.Ct. at 1019–20. It differentiated the contractual rights that a plaintiff seeks to vindicate through the arbitral process from the "distinctly separate nature" of "statutory rights accorded by Congress" and found that the separateness of the remedies should not be "vitiated merely because both were violated as a result of the same factual occurrence[;] ... certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums." *Id.* at 50, 94 S.Ct. at 1020.

The Court further held that Title VII claims could not be waived through the collective bargaining process. *Id.* at 51, 94 S.Ct. at 1020–21. A union may waive certain statutory rights related to collective activity, such as the right to strike, because, as the Court noted, these rights "are conferred on employees collectively to encourage the processes of collective bargaining and properly may be exercised or relinquished by the union as collective-bargaining agent to obtain economic benefits for union members." *Id.*

at 51, 94 S.Ct. at 1021. However, Title VII, found the Court,

> stands on plainly different ground; it concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII. In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver.

*Id.* at 51, 94 S.Ct. at 1021. The proposition of individual rights established in *Gardner–Denver* was extended in two later Supreme Court cases. *See Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (holding that plaintiff truck drivers' claims under Fair Labor Standards Act were not precluded by their unsuccessful participation in grievance procedure mandated by CBA); *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (holding that arbitration decision made pursuant to clause in CBA and holding that plaintiff was discharged for just cause did not preclude a subsequent action by plaintiff under 42 U.S.C. § 1983).

Seventeen years later, the Supreme Court decided *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Gilmer had been required by his employer to register as a securities representative with the New York Stock Exchange ("NYSE"). His registration application with the NYSE contained an agreement to arbitrate "any dispute, claim or controversy" arising between him and defendant Interstate "that is required to be arbitrated under the rules" of the NYSE. The NYSE required arbitration of "[a]ny controversy between a registered representative and any member or member organization arising out of the employment or termination

of employment of such registered representative." *Id.* at 23, 111 S.Ct. at 1650–51.

After Gilmer was terminated, he filed a charge with the EEOC alleging that he had been discharged in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"). The defendant moved to compel arbitration pursuant to the NYSE registration application. Relying upon *Gardner–Denver,* the district court denied the motion and the Court of Appeals for the Fourth Circuit reversed.

The Supreme Court affirmed the Fourth Circuit, deciding the case under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.,* which expresses the "liberal federal policy favoring arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Section 2 of the Act provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It held that because the clause in Gilmer's registration application was broad enough to encompass statutory claims and because Gilmer had not demonstrated that Congress intended to preclude the waiver of a judicial forum for the statutory ADEA claim, the arbitration clause should be enforced.

*Gilmer* expressly repudiated the view in *Gardner–Denver* that arbitration was inferior to the judicial process for resolving statutory claims, stating, "[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." *Gilmer,* 500 U.S. at 34 n. 5, 111 S.Ct. at 1656 n. 5 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626–27, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985)).[2] The Court noted that

---

2. The *Gilmer* Court observed that the "mistrust of the arbitral process [expressed in *Gardner–Denver*] has been undermined by our recent decisions." *Gilmer,* 500 U.S. at 34 n. 5, 111 S.Ct. at 1656 n. 5. *See Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 480,

"[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer,* 500 U.S. at 26, 111 S.Ct. at 1652 (quoting *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. at 3354).

However, the *Gilmer* Court took great pains to distinguish its holding from that in *Gardner–Denver,* leaving the continued vitality of the latter case largely intact. First, it noted that those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims but instead raised the "quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims." *Id.* at 35, 111 S.Ct. at 1657. It observed that because the plaintiff in *Gardner–Denver* had not agreed to arbitrate his statutory claims, the labor arbitrators were not authorized to resolve those claims, and thus the arbitration in those cases "understandably was held not to preclude subsequent statutory actions." *Id.* Secondly, *Gardner–Denver* occurred in the context of a collective bargaining agreement and the claimants were represented by their unions in the arbitration proceedings. Therefore, the *Gardner–Denver* Court was concerned about the "tension between collective representation and individual statutory rights, a concern not applicable to the present case." *Id.* Lastly, those cases were not decided under the FAA, "which ... reflects a liberal federal policy favoring arbitration agreements." *Id.* (citation omitted).

■ Nieves urges the Court that under the reasoning of *Gardner–Denver* and its progeny, her failure to utilize or exhaust the remedies available to her under the CBA should not preclude her action under the ADA. Individualized Shirts argues that *Gilmer* is controlling and that Nieves' complaint should be dismissed because she did not go through the grievance and arbitration process.

Neither the Third Circuit nor courts in this district have considered whether an employee's failure to exhaust administrative remedies pursuant to a collective bargaining agreement precludes her bringing statutory claims to federal court. Individualized Shirts urges the Court to follow the reasoning of the Fourth Circuit in *Austin v. Owens–Brockway Glass Container,* 78 F.3d 875 (4th Cir.1996), which extends *Gilmer* to collective bargaining agreements containing arbitration clauses. The plaintiff therein, a union employee, was injured on the job and requested light duty work. Told that none was available, she was placed on leave and provided with workers compensation benefits. While she was on leave, the defendant eliminated her position and terminated her employment. Austin filed suit against the defendant under Title VII and the ADA. A divided Fourth Circuit affirmed, holding that *Gilmer* precluded Austin from bringing the lawsuit because she had agreed in her collective bargaining agreement to resolve the dispute via binding arbitration. *Id.* at 886.

*Austin* has not been universally accepted, and for good reason. The Court agrees with the assessment of the dissent and most other courts which have considered the issue that *Austin* fails to come to grips with the fundamental fact that *Gardner–Denver* is still the law. The *Gilmer* Court went out of its way to distinguish its holding from that of *Gardner–Denver.* It recognized the established difference between an individual employment contract and a collective bargaining agreement and the policies which permit the waiver of statutory rights in the former but not in the latter. In an individual employment contract, one may surrender any of his or her statutory rights unless Congress has expressed the intent that a particular right cannot be surrendered. However, in a collective bargaining agreement, the rights at

483, 109 S.Ct. 1917, 1919–20, 1921, 104 L.Ed.2d 526 (1989) (holding that securities fraud claims arising under § 12(2) of the Securities Act of 1933, 15 U.S.C.A. § 77*l*(2), are arbitrable); *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 238, 242, 107 S.Ct. 2332, 2343–44, 2345–46, 96 L.Ed.2d 185 (1987) (ruling that claims of securities fraud arising under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and claims arising under civil provisions of the Racketeer Influenced and Corrupt Organizations Act (civil RICO), 18 U.S.C.A. § 1961 *et seq.,* are arbitrable); *Mitsubishi,* 473 U.S. at 629, 105 S.Ct. at 3355 (ruling that antitrust claims arising under the Sherman Act, 15 U.S.C.A. § 1 *et seq.,* may be arbitrable).

issue are solely those within the confines of the agreement itself—they are contractual. Although an individual employment contract can address both contractual and statutory rights, a collective bargaining agreement, by its very nature, may only address the common, contractual rights of the members of the bargaining unit. Under a collective bargaining agreement, such members, the employees, are represented by the union. The *Gilmer* and *Gardner–Denver* Courts sought to prevent the potential subjugation of individual rights to the rights and interests of the majority represented by the union.

Also, unlike *Gardner–Denver* and its offspring, *Gilmer* was decided under the FAA. *Austin* did not consider the FAA because the Fourth Circuit does not apply the FAA to labor disputes arising from collective bargaining agreements. That court interprets the exclusionary clause in § 1 of the FAA as excluding collective bargaining agreements from coverage of that statute. However, the Third Circuit has held that the FAA's exemption of coverage for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," 9 U.S.C. § 1, is limited to those employment contracts in the transportation industries and does not affect collective bargaining agreements in other areas. *Tenney Engineering, Inc. v. United Elec. Radio & Mach. Workers of America*, 207 F.2d 450 (3d Cir.1953).[3]

Although the FAA governs collective bargaining agreements in this Circuit, the Court does not believe that departure from *Gardner–Denver* is justified for the reasons stated by the Supreme Court there and in *Gilmer*. *See also Pryner v. Tractor Supply Co., Inc.*, 927 F.Supp. 1140, 1147 (S.D.Ind.1996) (holding that despite applicability of FAA, the court remains bound by the decision in *Gardner–Denver*.). Most courts to consider the issue agree that *Gilmer* does not extend to cases where collective bargaining agreements are involved. *See EEOC v. Board of Governors of State Colleges and Univs.*, 957 F.2d 424, 431 & n. 11 (7th Cir.) ("[I]t is well-established that unions cannot waive employees' ADEA or Title VII rights through collective bargaining."), *cert. denied*, 506 U.S. 906, 113 S.Ct. 299, 121 L.Ed.2d 223 (1992); *Pryner*, 927 F.Supp. at 1140; *Bush v. Carrier Air Conditioning*, 940 F.Supp. 1040, 1044–46 (E.D.Tx.1996); *DiPuccio v. United Parcel Service*, 890 F.Supp. 688, 692–93 (N.D.Ohio 1995); *McGinnis v. Wonder Chemical Co.*, No. 954384, 1995 WL 756590, at *2 n. 1 (E.D.Pa. December 21, 1995); *Griffith v. Keystone Steel & Wire Co.*, 858 F.Supp. 802, 804 (C.D.Ill.1994); *Randolph v. Cooper Indus.*, 879 F.Supp. 518, 520–23 (W.D.Pa.1994); *Block v. Art Iron, Inc.*, 866 F.Supp. 380, 387 (N.D.Ind.1994); *Claps v. Moliterno Stone Sales, Inc.*, 819 F.Supp. 141, 146–47 (D.Conn. 1993). *But see Austin*, 78 F.3d at 877–86; *Jessie v. Health Care Center, Inc.*, 930 F.Supp. 1174 (E.D.Ky.1996); *Knox v. Wheeling–Pittsburgh Steel Corp.*, 899 F.Supp. 1529, 1536–40 (N.D.W.Va.1995).

---

**3.** The Third Circuit recently decided *Great Western Mortgage Corp. v. Peacock*, 110 F.3d 222 (3d Cir.1997), in which it confirmed the continued vitality of *Tenney*. *Id.* at 226–27. Some had questioned whether *Tenney* was still good law in light of two less recent Third Circuit decisions, *Service Employees Int'l Union Local No. 36 v. Office Center Serv., Inc.*, 670 F.2d 404, 406 n. 6 (3d Cir.1982) (noting, in dicta, that it is more likely that the broad principles of arbitral primacy and judicial deference to labor arbitration announced in the *Steelworkers* trilogy of cases, rather than the FAA, govern collective bargaining agreements) and *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1120 (3d Cir.1993) (observing, without citing to authority, that "contracts of employment are explicitly exempted from the FAA" and "the FAA by its own terms does not apply to employment contracts.") *Tenney*'s view of § 1's limited scope is shared by nearly every circuit to have considered the issue. *Compare Rojas v. TK Communications, Inc.*, 87 F.3d 745 (5th Cir.1996) (adopting narrow reading of § 1's exclusionary clause); *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 600–01 (6th Cir.1995) (same); *Miller Brewing Co. v. Brewery Workers Local Union No. 9*, 739 F.2d 1159, 1162 (7th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985) (same); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1069 (2d Cir.1972) (same); *Dickstein v. duPont*, 443 F.2d 783, 785 (1st Cir.1971) (same); *Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers*, 207 F.2d 450 (3d Cir. 1953) (same) with *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305 (6th Cir.1991) (in dicta, adopting broad reading of § 1's exclusionary clause); *United Electrical, Radio & Machine Workers v. Miller Metal Prods.*, 215 F.2d 221, 224 (4th Cir. 1954) (same).

Individualized Shirts argues that *Gardner–Denver* is inapplicable because, unlike in that case, Nieves failed to utilize the grievance process at all. *Gardner–Denver* only addressed whether after an unfavorable arbitration, a plaintiffs statutory claims should be precluded, not whether her failure to even bring a grievance should bar her from the courtroom. However, *Gardner–Denver* did not find the plaintiffs initial resort to the mandatory grievance and arbitration procedures significant. Nor have other courts. *See Randolph,* 879 F.Supp. at 520 (plaintiff advised supervisors of harassment but made no formal grievance); *McGinnis,* 1995 WL 756590 at *2 n. 1 (plaintiff did not file grievance nor go to arbitration but went directly to the EEOC); *Claps,* 819 F.Supp. at 143 (plaintiff wrote complaining letters but did not utilize grievance and arbitration procedures). *Gardner–Denver*'s unmistakable import is that the existence of a mandatory grievance process will not prevent bringing separate, statutory claims in court.

Nieves' claims are purely based on her statutory rights and do not involve the contractual provisions in the CBA. Therefore, her failure to exhaust administrative remedies does not prevent her from asserting her ADA claims in this Court.

B. *Whether Nieves' NJLAD Claim Is Preempted By Section 301 Of The LMRA.*

State law suits which allege violations of collective bargaining agreements are preempted by § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 103–04, 82 S.Ct. 571, 576–77, 7 L.Ed.2d 593 (1962). Moreover, when state claims require interpretation of a collective bargaining agreement to determine the content and scope of the agreement, and what legal consequences were intended to flow from a breach of an agreement, § 301 completely preempts such claims. *Id.; see Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 1915–16, 85 L.Ed.2d 206 (1985). However, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining

agreement, is preempted by § 301 or other provisions of the federal labor law." *Id.* at 211, 105 S.Ct. at 1911.

■ Individualized Shirts argues that Nieves' disability discrimination claims are inextricably intertwined with the provisions of the collective bargaining agreement and are thus preempted by § 301. *Compare Kube v. New Penn Motor Express, Inc.,* 865 F.Supp. 221 (D.N.J.1994) (no preemption of NJLAD disability discrimination claim because elements of claim did not require interpretation of CBA provisions); *DiPuccio v. United Parcel Serv.,* 890 F.Supp. 688, 690 (N.D.Ohio 1995) (rejecting preemption argument because elements of handicap discrimination claim did not require consideration of the collective bargaining agreement) *with Maher v. New Jersey Transit R.O., Inc.,* 125 N.J. 455, 480, 593 A.2d 750 (1991) (finding preemption of NJLAD disability discrimination claim where adjudication of the claim requires interpretation of the collective bargaining agreement.) The defendants urge us to find that the facts of this case are closer to *Maher* than to *DiPuccio* or *Kube.*

In review, the CBA here makes no reference to accommodation for disabled employees, nor does it cover working conditions at the factory. *Maher* noted that a "handicapped person's physical or mental limitations may affect his or her ability to function at work. . . . [E]valuation of an employee's disability and its effect on job performance is a proper subject for arbitration." *Maher,* 125 N.J. at 482, 593 A.2d 750. However, the facts of that case are clearly distinguishable. There, the CBA required employee compliance with all New Jersey Transit (NJT) safety rules. The plaintiff, a signalman, asserted that NJTs refusal to exempt him from a rule that required him to wear safety glasses despite his sight disability violated his rights under the NJLAD. The incorporation of NJT safety rules in the CBA meant that any consideration of his NJLAD claims required reference to the agreement and NJTs safety rules and requirements.

This case is more similar to *Kube* and *DiPuccio* than to *Maher.* In *Kube,* the CBA lacked any provision putting into effect a plan for accommodating handicapped em-

ployees. *Kube,* 865 F.Supp. at 228 (D.N.J. 1994). Nor was there any allegation that an accommodation program was implemented pursuant to the CBA or that the plaintiffs handicap was evaluated pursuant to any such program. *Id.* Similarly, in *DiPuccio,* the CBA did not establish safety requirements of "essential job functions" applicable to the plaintiffs position as a driver; therefore, reference to the CBA was not required. *DiPuccio,* 890 F.Supp. at 692.

■ Individualized Shirts makes much legal hay of the CBAs lack of a clause requiring company-wide seniority rights. The lack of such a policy means that the company could not place Nieves in the computer room upon her return to the company if it would require displacing another employee. However, the silence of the agreement is just that—no reference to the CBA is required. Individualized Shirts also refers to the CBA's civil rights clause to bolster its argument that the CBA is relevant. There are two answers to that argument. First, Nieves has not invoked the clause and asserted that her contractual rights were breached. Moreover, even if she had,

> the mere fact that a broad contractual protection against discriminatory ... discharge may provide a remedy for conduct that coincidentally violates state law does not make the contours of the state-law violation dependent upon the terms of private contract. For even if an arbitrator should conclude that the contract does not prohibit a particular discriminatory ... discharge, that conclusion might or might not be consistent with a proper interpretation of state law.

*Kube,* 865 F.Supp. at 228 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 412–13, 108 S.Ct. 1877 1885, 100 L.Ed.2d 410 (1988)). Nieves' statutory rights under the NJLAD are quite separate. Second, the CBA civil rights clause does not even mention disability. It only prohibits discrimination "on account of race, color, religion, creed, sex, or national origin." Although it states, "[T]his clause shall be interpreted broadly to be coextensive with all federal, state, or local anti-discrimination laws and where available, judicial interpretation there-

of," one could well argue plausibly that such interpretive breadth refers only to the stated categories.

The CBA is completely tangential to a determination of Nieves' claims under the NJLAD. Thus, her claims are not preempted by § 301 of the LMRA.

C. *Whether Nieves Can Establish A Prima Facie Case Under the ADA.*

Nieves asserts claims of disability discrimination and failure to accommodate against Individualized Shirts. The ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112.

1. *Nieves' claim of discriminatory discharge.*

To qualify for relief under the ADA, a plaintiff claiming wrongful termination must establish that (1) she is disabled within the meaning of the ADA; (2) she is a qualified individual with a disability; and (3) she was terminated or discriminated against because of her disability. *White v. York Int'l Corp.,* 45 F.3d 357 (10th Cir.1995); *Freeman v. Rollins Environmental Servs. of New Jersey,* 1996 WL 451317 *4 (D.N.J.1996). The plaintiff must make a prima facie showing that reasonable accommodation is possible. *Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir.1996) (dealing with analogous context of Rehabilitation Act of 1973). If the plaintiff is able to meet this burden, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer. *Id.*

Defendants do not appear to dispute that Nieves was terminated because of her condition or that she was otherwise qualified for the position. Rather, they argue that

Nieves' condition did not rise to the level of a disability under the ADA.

The ADA defines "disability" as

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The statute is in the disjunctive, indicating that Nieves need only satisfy one of the above characteristics.

Regulations promulgated by the EEOC illumine these provisions. "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). Sitting and standing are also considered major life activities. 29 C.F.R., App. to part 1630, § 1630.2(i). A person's abilities are "substantially limited" when they are "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). A court should consider: "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

■ Nieves does not contend that her varicose veins affect her ability to work.[4] Rather, she argues that her condition prevents her from "standing for prolonged periods of time" and thus is a "physical disability" which "prevents the normal exercise of [her] bodily functions." She presents the report of a doctor who concludes that her condition is "permanent, probably progressive despite the surgery and will continue to substantially limit her physical ability for the rest of her

life." Arber Certif., Exh. E. The Court notes that the doctor's conclusions are based substantially upon Nieves' reported complaints of "interference with [sexual activity], ... difficulty walking in malls, ... fatigue and pain in her legs ... disrupt[ion] of [her] sleeping pattern ... [and] difficulty exercising." The report is dated July 19, 1996. On May 2, 1996, Nieves testified at her deposition as follows:

Q: Do you still suffer from the same disability that you suffered from in October of 1994?

A: Somewhat, I still get swelling, occasional pain if I'm standing for a long time.

Q: Are there any restrictions on your activities now?

A: Not necessarily, only doctor's orders, you know, that I have to elevate my legs a few hours of the day, which I do, and I wear the stockings if I'm going to do a lot of standing, that's it.

Q: You only have to wear the stockings if you're going to be standing for a long time?

A: Sometimes. It depends. Sometimes I have to wear them even if I'm not standing, even at home if I'm standing doing something, you know. I put them on because I do feel like the surgery, from the incision, sometimes I get a little throbbing in there.

Nieves Dep. at 60:145—61:4. Nieves' testimony both supports and undercuts her expert's opinion. At the least, Nieves has created a fact question as to whether her condition "substantially limits" her ability to stand, a question which is inappropriate for resolution on a summary judgment motion.

■ Secondly, the Court considers whether a question of fact exists as to whether Nieves is a "qualified individual with a disability." The ADA defines such an individual as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that

---

4. Nor could she. The regulations indicate that an individual must be significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes. 29 C.F.R.

§ 1630.2(j)(3)(i). Nieves has since been employed as a teacher's aide and a bus driver—clearly, her condition does not prevent her from working.

such individual holds or desires." 42 U.S.C. § 12111(8). First, the Court must consider whether Nieves is a "qualified individual with a disability" and can perform the essential functions of the position, with or without reasonable accommodations. *Freeman,* 1996 WL 451317 (D.N.J.1996); *Tyndall v. National Educ. Ctrs.,* 31 F.3d 209 (4th Cir.1994). Second, if necessary, the Court must consider what constitutes a reasonable accommodation. *Freeman,* 1996 WL 451317 *5.

It is undisputed that Nieves' ability as a cuff cutter was well regarded. Her rehiring after maternity, personal, and medical leave, and her transfer to the cuff cutting position demonstrate the defendants' satisfaction with her work. In fact, the defendants do not appear to claim that Nieves could not perform the essential functions of the position of cuff cutter, with or without reasonable accommodation. Nieves introduces a report by an expert stating that her disability could have been accommodated at minimal cost by a reconfigured work station. She has therefore presented evidence from which a jury could find that she has established a prima facie case of disability discrimination.

The burden then shifts to Individualized Shirts to introduce evidence that the accommodations sought by Nieves are "unreasonable, or would cause an undue hardship on the employer." *Shiring,* 90 F.3d at 831. The defendants have submitted evidence, in the form of an expert report and testimony from employees that accommodation would be unsafe, inefficient and reduce both the company's profitability and her compensation. The reasonableness of the proposed accommodation is for the jury to decide. Therefore, summary judgment is inappropriate for either party on this claim.

### 2. *Nieves' claim of failure to accommodate.*

Unlawful discrimination under the ADA also includes the failure to make

> reasonable accommodations to the known ... limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose undue hardship on the

operation of the business of such covered entity.

42 U.S.C. § 12112(b)(5)(A). "Reasonable accommodation" includes:

> (A) making existing facilities used by employees readily accessible and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies ... [.]

42 U.S.C. § 12111(9). An "undue hardship" means "an action requiring significant difficulty or expense," when considered in light of the nature and cost of the accommodation, the type of business involved, and the size and financial resources of the covered entity and the particular facility. 42 U.S.C. § 12111(10); *Trotter v. B & S Aircraft Parts & Accessories, Inc.,* 1996 WL 473837 *10 (D.Kan.1996).

■ Individualized Shirts was well aware of Nieves' condition, for which she requested accommodation. Nieves presents evidence that she could have been reasonably accommodated. The defendants counter that evidence with their own. Accordingly, the Court finds that a genuine issue of material fact exists.

The Court concludes that summary judgment is unwarranted because genuine issues of material fact exist as to whether (1) Nieves' varicose veins substantially affected her ability to stand; and (2) whether the defendants could have reasonably accommodated her condition.

### D. *Whether Nieves Can Establish A Prima Facie Case Under The NJLAD.*

■ Under the NJLAD, an employer may not

> refuse to hire or employ or ... bar or ... discharge or require to retire, unless justified by lawful considerations other than age, from employment [an] individual or ... discriminate against such individual in compensation or in terms, conditions or

privileges of employment on discriminatory grounds.

N.J.S.A. 10:5–12a. The NJLAD expressly extends such protection to the handicapped, "unless the nature and extent of the handicap reasonably precludes the performance of the particular employment." N.J.S.A. 10:5–4.1. The elements of a prima facie case of discrimination due to handicap are:

> (1) the complainant was handicapped within the meaning of the law; (2) the complainant had been performing his or her work at a level that met the employer's legitimate expectations; (3) the complainant nevertheless had been fired; (4) the employer had sought another to perform the same work after complainant had been removed from the position.

*Maher v. New Jersey Transit R.O.*, 125 N.J. 455, 480–81, 593 A.2d 750 (1991). The burden-shifting analytic framework established under Title VII applies to actions brought under the NJLAD. *Shaner v. Horizon Bancorp.*, 116 N.J. 433, 561 A.2d 1130 (1989); *Clowes v. Terminix Int'l Inc.*, 109 N.J. 575, 538 A.2d 794 (1988). The plaintiff bears the initial burden of making a prima facie case. If she succeeds, the burden of production shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions. If the defendant carries its burden, the plaintiff then must show that the proffered reason is merely a pretext for unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff will survive summary judgment if she can produce sufficient evidence that the employer's proffered reasons for the allegedly discriminatory action are merely a fabricated justification for that action. *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir.1995).

 N.J.S.A. 10:5–5 defines "handicapped," in pertinent part, as

> suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness ... or from any mental, psychological or developmental disability resulting from physical disability, infirmity, malformation or disfigurement which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques.

N.J.S.A. 10:5–5(q). Because the NJLAD is remedial social legislation, "it is deserving of a liberal construction." *Clowes*, 109 N.J. at 590, 538 A.2d 794. The New Jersey Supreme Court has held that "handicap" does not apply only to the so-called "severe disabilities." *Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 446 A.2d 486 (1982). Reflecting this philosophy, courts generally take an expansive view of "handicap." *See, e.g., Andersen*, 89 N.J. at 483, 446 A.2d 486 (back ailment); *Panettieri v. C.V. Hill Refrigeration*, 159 N.J.Super. 472, 388 A.2d 630 (App.Div.1978) (heart attack); *Clowes*, 109 N.J. at 575, 538 A.2d 794 (alcoholism); *Gimello v. Agency Rent–A–Car Sys., Inc.*, 250 N.J.Super. 338, 594 A.2d 264 (App.Div.1991) (obesity). Although no New Jersey court has passed upon whether varicose veins are a "handicap", the Court is confident that given the liberal interpretation of the NJLAD, Nieves has submitted enough evidence to create a triable issue of fact.

No issue of material fact exists as to the other three elements of Nieves' prima facie case. It is undisputed that she was performing her job in a manner that met the defendants legitimate expectations, that she was terminated; and that her termination was a result of her disability. Therefore, Nieves could establish a prima facie case.

 The burden would then shift to the defendants to "demonstrate either the reasonableness of the otherwise-discriminatory act or the presence of a non-discriminatory reason for the employee's treatment." *Maher v. New Jersey Transit R.O.*, 125 N.J. 455, 481, 593 A.2d 750 (1991). "In deciding whether the nature and extent of an employee's handicap reasonably precludes job performance, an employer may consider whether the handicapped person can do his or her work without posing a serious threat of injury to the health and safety of himself or herself[.]" *Id.* (quoting *Jansen v. Food Cir-*

*cus Supermarkets,* 110 N.J. 363, 382, 541 A.2d 682 (1988)).

■ Nieves rests her conclusion that she is entitled to summary judgment on her assertion that she has established a prima facie case. She neglects entirely the burden shifting analysis necessary in such cases. Individualized Shirts' submissions could fairly be read to mean that its decision to terminate Nieves was based upon legitimate business and safety concerns, and it has submitted supporting evidence in the form of an expert report and testimony from Nieves' co-workers. Nieves must then submit evidence from which a jury could find that those reasons are somehow unreasonable or pretextual. This she has done, in the form of an expert report which states that accommodation of her disability could have been made at very low cost and difficulty. Both sides have produced evidence supporting their position, thus creating a genuine issue of material fact which precludes summary judgment.

Therefore, the Court declines to grant summary judgment to either party on the NJLAD claim.

E. *Whether Nieves Can Establish a Prima Facie Case Of Intentional Infliction of Emotional Distress.*

■ To establish a claim of intentional infliction of emotional distress, Nieves must prove (1) intentional and outrageous conduct by the defendants or that the defendants acted recklessly in deliberate disregard of a high degree of probability that emotional distress would follow; (2) proximate cause; and (3) severe distress. *Buckley v. Trenton Saving Fund Soc.,* 111 N.J. 355, 366, 544 A.2d 857 (1988). Liability will not attach unless the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting Restatement (Second) of Torts § 46 comment d). The emotional distress suffered by the plaintiff must be "so severe that no reasonable man could be expected to endure it." *Buckley,* 111 N.J. at 366, 544 A.2d 857 (quoting Restatement, comment j). When intentional conduct is directed at plaintiff, she

need not prove any physical injury. *Buckley,* 111 N.J. at 367, 544 A.2d 857.

■ Individualized Shirts argues that Nieves can neither prove that its conduct in terminating her employment was outrageous nor that she has endured severe distress. Nieves contends that defendants were aware of her disability and coaxed her to return as a cuff cutter in return for the concession that she could work part-time in a sit down position, a compromise which was never implemented. Despite her repeated complaints of pain and requests for a sit down position, the defendants terminated her without attempting to accommodate her.

■ In Nieves' deposition testimony, she stated that after her discharge "[she] was depressed, [her] kids were affected, [her] daughter had problems in school because of [her] ... anger, frustration, financial—[her] credit was ruined." She expressed her frustration and concern over being the "sole supporter" of her children, stating,

> There were times they needed clothing, you know, things ... for school ... I mean, sometimes I couldn't dress them nicely. [T]hey would get teased by other kids, and my daughter was retained to the same grade. I believe it had to do with what I was going through.

No reasonable fact finder could conclude, on this record, that Nieves suffered extreme distress or that the conduct of Individualized Shirts in terminating her employment existed beyond the bounds of civilized conduct. Plaintiffs understandable frustration and depression over losing her job does not rise to the level of "severe distress." *Buckley,* 111 N.J. at 368, 544 A.2d 857 (complaints of sleeplessness, aggravation, embarrassment and headaches insufficient). She makes no allegations that her distress interfered with her everyday functioning. *Buckley,* 111 N.J. at 368, 544 A.2d 857 (citing *Venerias v. Johnson,* 127 Ariz. 496, 622 P.2d 55 (App.1980)). She expresses concern about supporting her children and laments not being able to buy nice clothes for them but does not state that she worried about feeding and clothing them. *See Buckley,* 111 N.J. at 369, 544 A.2d 857 (citing *Fletcher v. Western National Life Ins.*

*Co.,* 10 Cal.App.3d 376, 385, 89 Cal.Rptr. 78 (4th Dist.1970)).

The Court finds that Nieves has not set forth evidence from which a jury could conclude either that the defendants' conduct was outrageous or that she suffered severe distress. Therefore, it grants summary judgment to the defendants on this claim.

## V. *Conclusion*

For the foregoing reasons, the Court holds that Nieves may proceed with her ADA claims against Individual Shirts despite her failure to utilize the grievance procedures in the CBA. It further holds that her NJLAD claim is not preempted by section 301 of the LMRA. The Court grants summary judgment to the defendants on the claim of intentional infliction of emotional distress and denies summary judgment to both parties as to the claims under the ADA and NJLAD.

**SO ORDERED.**