

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-15-1999

# Durham Life Ins Co v. Evans

Precedential or Non-Precedential:

Docket 97-1683,97-1712

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation
"Durham Life Ins Co v. Evans" (1999). *1999 Decisions.* Paper 9.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/9

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 15, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 97-1683 and 97-1712

DURHAM LIFE INSURANCE COMPANY

v.

DIANNE EVANS
(E.D. Pa. No. 94-cv-00801)

DIANNE EVANS, Appellant in No. 97-1712

v.

PEOPLES SECURITY LIFE INSURANCE COMPANY
(E.D. Pa. No. 95-cv-02681)

Durham Life Insurance Company and Peoples Security Life
Insurance Company, Appellants in No. 97-1683

On Appeal From the United States District Court
For the Eastern District of Pennsylvania

Argued: September 24, 1998

Before: BECKER, Chief Judge, WEIS and GARTH,
Circuit Judges.

(Filed January 15, 1999)

DANIEL MARINO, ESQUIRE
  (ARGUED)
Seyfarth, Shaw, Fairweather &
 Geraldson
815 Connecticut Avenue, NW
Suite 500
Washington, DC 20006-4004

Attorney for Durham Life Insurance
Company and Peoples Security Life
Insurance Company

RAYMOND J. QUAGLIA, ESQUIRE
  (ARGUED)
1313 Race Street
Philadelphia, PA 19107

Attorney for Dianne Evans

OPINION OF THE COURT

BECKER, Chief Judge.

These cross-appeals arise from the District Court's judgment following a bench trial in favor of Dianne Evans and against Durham Life Insurance Company ("Durham") and Peoples Security Life Insurance Company ("Peoples") on Evans's Title VII sex discrimination counterclaim; in favor of Durham/Peoples on Evans's claim for punitive damages; and in favor of Evans on Durham/Peoples' claim for Evans's breach of a non-competition agreement. Most importantly, the appeal of Durham/Peoples, which comes in the wake of the Supreme Court's landmark sexual harassment decisions last Term, Faragher v. City of Boca Raton, 118 S. Ct. 2275 (1998), and Burlington Industries, Inc. v. Ellerth, 118 S. Ct. 2257 (1998), requires us to explicate several of the ways in which employers may be held liable under Faragher and Ellerth. In the course of so doing, we must also flesh out the notion of tangible adverse action.

Evans was a successful life insurance salesperson earning close to six figures with Metropolitan Life Insurance

2

Co. when she was recruited away and began working for Durham. She enjoyed even greater success in herfirst two years with Durham, but when Durham was acquired by Peoples and new management took over, her situation changed for the worse. According to Evans's trial evidence, essentially credited by the District Court, the new management resented her for being a successful woman and set out to undermine her, humiliating her personally with sexist remarks and crude sexual advances, and stripping her of the support she needed to do her job, support that had been a negotiated condition of her employment at Durham. Ultimately, when her private office was taken away and critical files mysteriously disappeared, she resigned and began to work for a competing insurance company. Durham thereupon sued Evans, seeking an injunction and damages for breach of a noncompetition agreement Evans had signed while in Durham's employ. Evans counterclaimed, alleging sex discrimination, defamation, and intentional infliction of emotional distress.

The District Court found that the noncompetition agreement was no longer in effect and that Evans had suffered a hostile work environment. It entered judgment in her favor for $310,156 in lost earnings and fringe benefits and $100,000 for intentional infliction of emotional distress. It found against Evans on her defamation claim.

Durham makes numerous claims on appeal. (We will now refer to Durham and Peoples, Durham's successor, as "Durham.") It challenges the District Court's fact finding on the ground that the allegedly offending incidents were so few and far between and their veracity so suspect that we should set the verdict aside as clearly erroneous. We decline that invitation. Durham also disputes its liability for the acts of its supervisory employees under Ellerth and Faragher. We conclude that Durham is not entitled to the affirmative defense that Evans unreasonably failed to use an available effective sexual harassment policy because the defense is only available in the absence of tangible adverse employment action, and Evans suffered such adverse action. The concept of a tangible adverse employment action is not limited to changes in compensation, although Evans's pay was certainly affected by the actions taken

3

against her. "Tangible adverse employment action" includes the loss of significant job benefits or characteristics, such as the resources necessary for an employee to do his or her job; that Evans suffered such loss is detailed infra.

Durham also contends that it is not liable for intentional infliction of emotional distress because Pennsylvania workers' compensation law preempts Evans's claim. Ultimately we need not resolve this difficult question, because we find that the award may be upheld under Title VII. Additionally, Evans challenges the District Court's refusal to award punitive damages, but we find this ruling to have been fairly within the court's discretion. Finally, Durham takes issue with the District Court's back pay award, but we uphold that also as within the court's discretion, particularly given Durham's acts after Evans left Durham's employment.

Durham alleges that Evans was bound by a covenant not to compete and argues that the collective bargaining agreement required her to grieve rather than sue. The District Court found that a vice president's statement to Evans that the covenant and the collective bargaining agreement were no longer in force estops Durham from enforcing them against her. This finding is not clearly erroneous. In view of all these conclusions, we will affirm the judgment of the District Court in its entirety.

I. Facts and Procedural History

The evidence adduced at trial, which we view in the light most favorable to Evans, the prevailing party at trial, see Keith v. Truck Stops Corp., 909 F.2d 743, 745 (3d Cir. 1990), showed the following facts. Evans was an extremely successful life insurance salesperson. She worked at Met Life for seventeen years, and in her last few years there she consistently earned $90,000 per year. Durham recruited her in 1991, promising her that she would have her own office and secretary, as well as unlimited phone and mailing costs paid for by Durham. When Evans joined Durham, she signed a non-competition agreement, which provided that, if she left, she could not sell insurance to Durham customers for a limited time. At Durham, she was covered

4

by the collective bargaining agreement in place between Durham and its agents while that agreement was in effect.

Durham was a "home service" or "debit" insurance company whose business generally came from door-to-door sales. Evans, however, was recruited as an "ordinary life agent," which meant that she sold a different type of policy. She worked almost exclusively from her office, encouraging existing debit customers to upgrade their policies. Evans's special skills and support system facilitated her success in the new job. She earned $128,000 in 1991 and $119,000 in 1992, mainly from commissions.

In 1991, Capitol Holding Company purchased Durham. In 1992, Capitol assigned the management of Durham to Peoples Security Life Insurance Company, and Peoples managers took over in October. Evans was the only full-time female life insurance agent at that location; there were thirty male agents. The collective bargaining agreement between Durham and its agents expired in November 1992. When it expired, Peoples unilaterally reduced the compensation rate of the agents. At that point, Tom Biancardi, a regional vice-president who was then negotiating with the union, told Evans that the collective bargaining agreement and the non-competition agreement were no longer in force. After that time, no new collective bargaining agreement was put in place.

The new managers, particularly William McKaskill and Doug Sebastionelli, believed that Evans should not continue to receive special treatment.[1] They told her that she did not fit the profile for a debit life insurance company: Her clothes and shoes were too expensive and she dressed too well for the job. McKaskill told her that she "made too much money for a goddamn woman." In March 1993, William Owens, the acting agency manager, asked Evans to go dancing "into the fields with him" and reminded her that he had the power to fire her if she did not behave as he wished. The next morning, he placed a newspaper article on her desk discussing a large verdict

---

1. McKaskill and Sebastionelli were Associate Customer Service Unit Leaders who were three levels above Evans in the hierarchy until mid-1993, when one of those levels was eliminated.

that Peoples had obtained against another life insurance company because of an agent who moved business from Peoples to the other company. At that time, Owens told her that if she reported the previous night's incident or if she quit and tried to take her business with her, Peoples would sue and "attach her house before she left the courtroom." Evans was frightened but did nothing because she wanted to succeed in the restructured company.

Evans suffered repeated slights from the new management. At an awards dinner, the top-selling agents were honored for selling more than $25,000 in premiums during a set period of time. Evans was the top producer, but while the exact sales numbers of the male agents were announced, Evans was only identified as selling in excess of the required minimum. Evans felt that she had been humiliated in front of her colleagues and her son, who was also present. At a training session in June 1993, she was publicly mocked for her walk and her speech by Chuck Gardner, an agency sales manager. Evans tried to retain the business of an important client, the Mercy Votech School, but the school administrators had questions that Evans needed legal help to answer. Although she was promised legal assistance from the home office, no one showed up at the scheduled meeting and Evans lost the account. Evans testified that male agents routinely received legal help when necessary. When she tried to explain to McKaskill what had happened, he cut her off and asked, "What do you know about annuities, you're only a woman."

The new managers fired Evans's secretary and attempted to get her to leave her private office. McKaskill came into her office and began to use it as his own on several occasions, disrupting Evans's work and ignoring her discomfort and embarrassment. In June or July 1993, McKaskill grabbed Evans's buttocks from behind while she was bending over her files and told her that she smelled good. She immediately left the office and never entered it again when McKaskill was at her desk. She did not report the incident because she wanted to avoid further humiliation and because she believed that McKaskill's position would allow him to decide her fate.

6

Management assigned Evans numerous "lapsed books," policies that were no longer active because the policy-holders had switched insurance companies. The agent assigned to a lapsed book was supposed to try to reactivate the policies. These were debit policies rather than the ordinary policies with which Evans was used to dealing. Evans initially responded to the changes by working hard on the lapsed books and performing well. However, because of the way commissions were calculated, the assignment of lapsed books had a severe negative impact on the calculation of Evans's bonus. Male agents were not assigned a similarly heavy load of lapsed books.

The problems came to a head in September 1993, when Jim La Grossa, the agency manager, told Evans that she was being transferred to another location. He instructed her to clear her furniture out of her office and assemble her files for the move. Evans complied, but when she returned on the next work day, she was informed that she was not moving at all. She was advised by her manager, John Heyman, that she no longer had an office and that her former office was now his conference room. La Grossa testified that Owens and McKaskill had pressured him for months to get Evans out of her office.

The "non-move" had an even more important consequence than Evans's public loss of her office. In preparation for the move, Evans had assembled all her files. Her files were uniquely important to her because, in the transition from the Durham computer system to the Peoples system, billing problems had developed for certain customer accounts. As a result, Evans was authorized to open a special bank account in which she would deposit pre-paid premiums and then pay the premiums as they came due using money orders and small amounts of cash, which were kept with her files. On the day she was told that she had lost her office, she also discovered that her files, including the money orders and cash, were gone. At that point, Evans concluded that she had been effectively fired because it was impossible for her to work without her files. A few days later, Evans sent a resignation letter stating that she was resigning based on the sex discrimination she had suffered and that she would pursue her legal remedies.

7

After her resignation letter, Evans three times requested a final audit of her accounts. It is industry policy, and also the policy of both Durham and Peoples, to allow an agent a final exit audit upon request when he or she leaves an insurance company's employ. It was Heyman's duty as agency manager to assume responsibility for Evans'sfiles after she left the company until another salesperson was assigned her customers and "book of business." Heyman refused her audit requests because he believed that she was not entitled to an audit and because he was already conducting an audit of Evans's debit book of business. Heyman knew, however, that the debit book comprised only a part of her accounts in view of her large number of ordinary policies; 575 of her 1272 customers were ordinary life accounts.

Evans then took a position at the Paul Revere Life Insurance Company. Heyman threatened to sue her if she moved any business from Durham/Peoples to Paul Revere. At Paul Revere, Evans replaced sixteen Durham/Peoples policies with Paul Revere policies. A male agent, Tom Burke, had moved to a different insurance company and replaced 170 Durham/Peoples policies, and Durham had not taken any action against him. Instead, Durham had assigned those lapsed policies to Evans.

If Heyman had conducted a final audit or allowed Evans access to her files, the billing problems that soon developed could have been prevented. Because he did nothing, however, customers began to receive notices that there were problems with their policies. Durham then wrote to all of Evans's customers that Evans had terminated her employment with Durham and could no longer act on Durham's behalf. The letter precipitated numerous inquiries about pre-payments that had been made to Evans. Because of the billing problems, these inquiries soon became complaints, and Durham forwarded the complaints to the Pennsylvania Insurance Department. In approximately three-fourths of the complaint cases, Evans had worked with her sales manager, Tom Carl, on the policies, and on many Carl had signed the application and policy, but only Evans was mentioned in the complaint letters.

Early in 1994, Durham sued Evans to enforce the covenant not to compete, seeking an injunction and damages for breach and alleging that Evans had intentionally interfered with a contract (the non-competition agreement). Also in 1994, Heyman sent a letter to the Pennsylvania Insurance Department that inaccurately stated that Evans had filed only two of five replacement forms required to replace certain policies. Heyman knew that failure to file replacement forms was a serious offense that would subject Evans to investigation and probably sanctions by the Insurance Department.

Before the events described above, Evans was in good mental health. After Peoples took over, she began to suffer from chest pains, severe headaches, nausea, and shortness of breath. When she started work at Paul Revere, her health improved, and she was in the management program at Paul Revere. She was the leading agency producer there until the litigation and the complaints to the Insurance Department began. After the lawsuit began and she learned of the complaints, her performance at Paul Revere declined sharply. She became absentminded, unable to concentrate on her duties, and obsessed with the litigation. According to Paul Revere, Evans no longer met the company's production requirements. She was dropped from the management program in late 1994, and her income was only $48,000 that year. In 1995, it dropped to $38,000, and it declined further to $28,000 the next year. Paul Revere estimated that she would only produce $15,000 in premiums for 1997. She would have been discharged but for the fact that she is on partial disability. Currently, she requires continuing mental health treatment to deal with her distress and depression.

II. Fact Finding in the District Court

In order to reject a district court's findings of fact, the reviewing court, after examining all the evidence, must be left with a definite and firm conviction that a mistake has been committed. When there are two permissible views of the evidence, the district court's choice between them cannot be clearly erroneous. See Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 525 (3d Cir. 1992).

Much of Evans's case against Durham comes down to a credibility contest. Evans says that certain incidents occurred and that Durham's managers had discriminatory motives. Durham disputes those claims, and argues, even on appeal, that Evans's factual position is so weak as to be unsupportable. Since Title VII does not have a corroboration requirement, Durham's attempts to resurrect its factual claims on appeal are unavailing.2 Although testimony on Durham's side contradicts Evans's, her story is facially plausible, and the district judge credited it. We see no basis for finding clear error here. See Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985) (when a district judge credits one of two opposed coherent and facially plausible stories and the story is not contradicted by extrinsic evidence, "that finding, if not internally inconsistent, can virtually never be clear error").

Durham complains that the District Court adopted Evans's proposed findings of fact with little alteration. Although we do not encourage verbatim adoption of proposed findings of fact, their review requires no greater scrutiny on appeal than other fact finding. See Lansford–Coaldale Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1215 (3d Cir. 1993). The District Court's discussion following its findings of fact demonstrated a keen familiarity with the record. Moreover, the court declined to adopt all of Evans's proposed findings, which shows that it was exercising independent judgment.3

_____

2. The McKaskill incident is an example. Evans testified that McKaskill grabbed her buttocks from behind. No one else witnessed it and she did not tell anyone about it until the lawsuit. Durham argues that she is therefore not credible. Durham repeats these arguments about many of the specific instances of harassment to which Evans testified. This strategem fails. Credibility determinations are for the finder of fact. See United States v. Bethancourt, 65 F.3d 1074, 1078 (3d Cir. 1995); Government of Virgin Islands v. Gereau, 502 F.2d 914, 921 (3d Cir. 1974). If the District Court found Evans a credible witness, it was perfectly correct to credit Evans's account even if she told no one at the time the harassment occurred. The only "prompt complaint" requirement in Title VII is the statute of limitations, and Evans's counterclaim was filed well within the statutory period.

3. Durham objects that some of the findings of fact contradict Evans's own testimony about the timeline of events. Evans was occasionally

10

Durham's main objection to the District Court'sfindings appears to be that the court aggregated numerous events to support its finding of a hostile work environment. Some of these events were apparently triggered by sexual desire, some were sexually hostile, some were non-sexual but gender-based, and others were facially neutral. Wefind no error, because Title VII may be applied to all of these types of conduct.

Title VII prohibits sex discrimination. Although"sex" has several common meanings, in Title VII it describes a personal characteristic, like race or religion. We generally presume that sexual advances of the kind alleged in this case are sex-based, whether the motivation is desire or hatred. Likewise, hostile or paternalistic acts based on perceptions about womanhood or manhood are sex-based or "gender-based."

"Gender" has often been used to distinguish socially- or culturally-based differences between men and women from biologically-based sex differences, but we have not considered "sex" and "gender" to be distinct concepts for Title VII purposes. See Price Waterhouse v. Hopkins, 490 U.S. 228, 250-51 (1989) (plurality opinion) (holding that reliance on gendered stereotypes of appropriate female behavior is sex discrimination); cf. Sheridan v. E.I. Dupont De Nemours & Co., 100 F.3d 1061 (3d Cir. 1996) (en banc) (using "sex" and "gender" interchangeably), cert. denied, 117 S. Ct. 2532 (1997); Wilson v. Susquehanna Township

_____

confused about when exactly certain incidents occurred, but it was hardly unreasonable for the court to have selected one of the timelines she offered. Moreover, Durham offers no explanation of why it would matter whether one of her superiors made his "pass" in May rather than June, which is the most that Durham's argument can be said to prove. Arguably, the more distant in time the event was from Evans's resignation, the less plausible is her claim that discrimination led her to
quit, but since she alleged a continuing, long-term series of harassing events not limited to sexual propositions, feuding over dates is unhelpful. See Hassine v. Jeffes, 846 F.2d 169, 172 n.1 (3d Cir. 1988) (adoption of defendant's proposed findings of fact that contained inconsistencies with defendant's earlier admissions was legitimate and did not "so undermine the ultimate conclusion that the district court reached" as to require reversal).

11

Police Dep't, 55 F.3d 126 (3d Cir. 1995) (characterizing a sexually hostile environment as evidence of gender bias). Therefore, we will treat the sexual misconduct and the gender-based mistreatment in this case as sex discrimination. The facially neutral mistreatment plus the overt sex discrimination, both sexual and non-sexual, in sum constituted the hostile work environment. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996) (acts of harassment, if motivated by sex or race, can constitute a hostile work environment regardless of their content); Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (3d Cir. 1990) (overtly sexual harassment is unnecessary to establish a sexually hostile work environment; discriminatory treatment is the only requirement).

As we stated in Andrews, the record must be evaluated as a whole when we consider whether Evans proved her case:

> Particularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities. A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.

Id. at 1484; see also Vicki Schultz, Reconceptualizing Sexual Harassment, 107 Yale L.J. 1683 (1998) (arguing that non-sexual harassment is often a major part of a hostile work environment). In its appeal, Durham attempts to disaggregate the various allegedly discriminatory acts and endeavors to cast doubt on each one, arguing that the overtly sexual acts did not occur and that the non-sexual actions taken against Evans have innocent explanations. We conclude, however, that the District Court appropriately refused to consider each incident in a vacuum and that its findings are not clearly erroneous.

III. Employer Liability

The next issue on appeal is whether Durham may be held liable for its supervisors' acts. Although Durham

12

presents extensive evidence and argument about its anti-
harassment policies, we find that they are not relevant to
this case because Evans's supervisors took tangible adverse
employment action against her.4

A. Liability under Ellerth and Faragher5

_____

4. We must briefly address a certain terminological confusion that
Durham uses to argue that the District Court made a mistake in finding
employer liability. At one point, the District Court stated that it did
not
see this case as a "disparate treatment" case, but as a "hostile work
environment" case. Thus, Durham suggests, only evidence of sexualized
abuse or sexual advances is relevant to Evans's claim, and that evidence
alone is insufficient. The District Court's characterization lacks
analytic
precision. Hostile work environment claims are founded in Title VII's
prohibition of unequal treatment of men and women; the hostile
environment here consisted of abuse that a man in Evans's position
would not have suffered. Perhaps the District Court simply meant that
there was no other employee who had Evans's abilities and her specially
negotiated benefits, so that there was no similarly situated person who
could have been better treated. In any event, the Supreme Court has
now made clear that labels such as "hostile work environment" are not
dispositive and that the ultimate issue is whether the plaintiff has
suffered actionable discrimination based on her sex. See Ellerth, 118
S. Ct. at 2264.

5. Although Judge Garth concurs in the result reached by Chief Judge
Becker, he cannot agree that the discussion of when and how the
affirmative defense provided by the holdings in Burlington Industries,
Inc.
v. Ellerth, 118 S. Ct. 2257 (1998), and Faragher v. City of Boca Raton,
118 S. Ct. 2275 (1998), and Chief Judge Becker's attempted clarification
of that defense, see infra, have a place in the opinion.

As Judge Garth reads the Supreme Court decisions, their holdings are
unequivocal and are directly applicable to this appeal without extending
the analysis beyond the facts of this case. Ms. Evans provided proof of
a tangible adverse employment action (i.e., she was made to leave her
job), and this action was on the basis of her supervisors' behavior. Here,
Ms. Evans was the subject of a tangible adverse employment action, the
District Court found that her supervisors were responsible for her
constructive discharge and the District Court returned a verdict
compensating her for the damages she suffered.

This being so, the initial holding in Faragher and Ellerth attaches and
binds us: "An employer is subject to vicarious liability to a victimized
employee for an actionable hostile environment created by a supervisor
with immediate (or successively higher) authority over the employee."

13

Durham argues that the District Court applied the wrong
liability standard because the Supreme Court's recent
sexual harassment liability decisions substantially
reshaped the law. In Ellerth and Faragher, the Supreme
Court drew a line between (1) discriminatory work-related
supervisory acts, such as discriminating against women in
work assignments to placate pervasive male hostility or
reprimanding women "in harsh or vulgar terms" while
merely bantering with men for identical behavior, and
(2) expressing sexual interest "in ways having no apparent
object whatever of serving an interest of the employer."
Faragher, 118 S. Ct. at 2289.

_____

Ellerth, 118 S. Ct. at 2270; Faragher, 118 S. Ct. at 2293. Judge Garth
believes that is all the Court is called upon to review through the lens
of
Ellerth and Faragher and he agrees that the District Court properly
entered judgment in favor of Ms. Evans.

However, Judge Garth takes no position and disassociates himself
from the discussion in Section III.A of Chief Judge Becker's opinion
involving situations and examples where no tangible adverse
employment action was taken, matters that concern the second holding
of Ellerth and Faragher. This second holding provides that "[w]hen no
tangible employment action is taken, a defending employer may raise an
affirmative defense to liability or damages," Ellerth, 118 S. Ct. at 2270;
Faragher, 118 S. Ct. at 2293, and specifies the elements that must be
established for the defense to prevail. (To the extent that Judge Weis in
his concurring opinion would make an affirmative defense available even
when a tangible adverse employment action resulted, Judge Garth
rejects his analysis as being contrary to and in derogation of the
explicit
holdings of Ellerth and Faragher).

In the present case, there is no issue that requires resort to the second
holding, and Judge Garth fears that unnecessary examples and
discussion, even in an attempt to enlighten the bar and bench, may only
lead to confusion when it does not clarify the standards to which this
Court must adhere. In a case such as this one, where Ms. Evans was
constructively discharged by her supervisors' action after their own
actionable behavior, the holdings and instruction of Ellerth and Faragher
are clear: the employer, Durham Life Insurance Company, is
automatically liable and no affirmative defense is available. The District
Court so held, and Judge Garth, in accordance with the separate
opinions of his colleagues, Chief Judge Becker and Judge Weis, agrees
that the District Court's judgment must be affirmed.

14

The first kind of discrimination, the Court concluded, would automatically subject the employer to liability because such discrimination is within the scope of the supervisor's employment, even if the employer does not want the supervisor to discriminate. Acts fall within the scope of employment when they are " `of the kind [a servant] is employed to perform,' occurring `substantially within the authorized time and space limits,' and `actuated, at least in part, by a purpose to serve the master.' " Id. at 2286 (quoting Restatement (Second) of Agency S 228(1) (1957) (alteration in original)). The Court further stated that "it is accepted that `it is less likely that a willful tort will properly be held to be in the course of employment and that the liability of the master for such torts will naturally be more limited.' " Ellerth, 118 S. Ct. at 2266 (quoting F. Mechem, Outlines of the Law of Agency S 394, at 266 (P. Mechem ed., 4th ed. 1952)).

The Court, after citing some of the various conflicting cases on scope of employment, and concluding that sexual harassment by a supervisor is generally not within the scope of employment, see id. at 2267, went on to parse the second category more carefully. In cases of harassment falling outside the scope of employment, the Court found, the employer could be vicariously liable when the"tortious conduct is made possible or facilitated by the existence of the actual agency relationship." Faragher, 118 S. Ct. at 2290. The Ellerth/Faragher "aided by the agency relation" test is divided into two categories:

> An employer is subject to vicarious liability to a
> victimized employee for an actionable hostile
> environment created by a supervisor with immediate
> (or successively higher) authority over the employee.
> When no tangible employment action is taken, a
> defending employer may raise an affirmative defense to
> liability or damages, subject to proof by a
> preponderance of the evidence, see Fed. Rule Civ. Proc.
> 8(c). The defense comprises two necessary elements:
> (a) that the employer exercised reasonable care to
> prevent and correct promptly any sexually harassing
> behavior, and (b) that the plaintiff employee
> unreasonably failed to take advantage of any preventive

15

> or corrective opportunities provided by the employer or
> to avoid harm otherwise. . . . No affirmative defense is
> available, however, when the supervisor's harassment
> culminates in a tangible employment action, such as
> discharge, demotion, or undesirable reassignment.

Ellerth, 118 S. Ct. at 2270; see also Faragher, 118 S. Ct. at 2292-93.

The aided by the agency relationship test is not, however, all-embracing. Rather, the Court discusses it only as a "starting point." Faragher, 118 S. Ct. at 2290 & n.3. One question is whether we should treat the supervisory acts in this case as falling within or without the scope of employment, for the scope of employment discussion is where the Court began its reformulation of Title VII jurisprudence. In a definitional sense, scope of employment plays no role in the Ellerth/Faragher test as such. But a sexual harassment plaintiff might still argue, in an attempt to avoid the affirmative defense, that the harassment she suffered falls within the scope of employment because her harassers intended, at least in part, to serve their employer. For example, the District Court found that McKaskill told Evans that she made "too much money for a goddamn woman" and that she did not know anything about annuities because she was "only a woman." This could readily be interpreted as evidencing a belief that women were not suited to Durham's business and a purpose to serve Durham by ridding it of Evans or at least of the qualities that made Evans stand out from other agents, which qualities the harassers apparently regarded as linked to her womanhood.

Although a scope of employment analysis would be theoretically possible here, we apply the Ellerth/Faragher aided by the agency relation test. We would have great difficulty deciding the case on scope of employment grounds in the absence of a specific finding by the District Court about the harassers' intent. We therefore believe that we can better evaluate Evans's claim by asking whether her harassers were aided by the harassment by the agency relation. More generally, we suggest that harassment that could be analyzed as falling within the scope of employment because of a supervisor's biased beliefs about a class of

16

workers--a claim that Evans might be able to make on
these facts--might be better evaluated in thefirst instance
under the more specifically delineated standards of the
Ellerth/Faragher aided by the agency relation test.6 Scope of

(Text continued on page 19)

_____

6. We note that despite the Court's attempt to attain "categorical
clarity,"
Faragher, 118 S. Ct. at 2290, there is a potential overlap between
harassment falling within the scope of employment and harassment
aided by the agency relationship, for "scope of employment" and "aided
by the agency relation" are not hermetically sealed concepts. Both may
fit the facts of a case, yet point towards dramatically different
liability
standards, since only in an "aided by the agency relation" situation is
the affirmative defense potentially available.

An example will elucidate the point. If a male supervisor routinely
delivered his reprimands to female employees by way of unwelcome
remarks and touching while treating male employees with respect, the
conduct would seem to fall in both categories, since the explicit sexual
misbehavior would suggest an aided by the agency relationship analysis,
while the disparate treatment with respect to work-related activities
would put the problem within the scope of employment. Even though
unwelcome remarks and touching might be done to gratify the harasser's
own desires, this situation would fall within the scope of employment
because the harassment would be the supervisor's manner of giving out
otherwise authorized reprimands to women. Giving reprimands is clearly
within the scope of the supervisor's authority, and the law of agency
teaches that the manner of doing an authorized act may subject an
employer to liability even though the employer instructs that the act be
done differently. See Ellerth, 118 S. Ct. at 2266. Although we doubt such
situations occur with any frequency, the example helps develop the issue
analytically.

The Court's conclusion that sexual harassment will ordinarily fall
outside the scope of employment connotes an expectation that sexual
harassment is often connected only opportunistically to the work
environment--that is, that supervisors' harassment usually does not
have any inherent relationship to the fact that the women targeted are
working women. However, there may be cases in which a harasser
thinks that he is doing what is best for his workforce when he deploys
sexual harassment as a weapon to drive female workers away. See, e.g.,
Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463 (9th Cir. 1994)
(finding that a supervisor used sexual harassment to reprimand a female
employee for her perceived failings as a worker rather than to fulfill his
desires). There are other cases in which sexual harassment seems
fundamentally connected to the work situation, as when it is part of a
campaign against women in nontraditional jobs. See, e.g., Annis v.

County of Westchester, 36 F.3d 251 (2d Cir. 1994); Bohen v. City of East Chicago, 799 F.2d 1180 (7th Cir. 1986); see also Schultz, supra, at 1755-61 (suggesting that a desire to preserve a masculine image of work often motivates sexual harassment). A supervisor who dislikes women for personal reasons may be predisposed to believe, however wrongly, that his employer would be better off without them, and his harassing acts could therefore be thought to fall within the scope of employment. Sexual harassment by co-workers may follow the same pattern and create the same analytic difficulties.

The distinction between acts within and without the scope of employment would turn on a fact finder's perception of whether the supervisor believed that he was acting, at least in part, in his employer's interests, perhaps because he believed that men were better workers. Yet it will often be difficult to distinguish personal misogyny falling outside the scope of employment from misogyny directed at female workers. Does a supervisor who satisfies his sexual urges by targeting women he perceives as worthless to his employer's business act sufficiently within the scope of his employment?

It is therefore difficult to reconcile intent as the touchstone of "scope of employment" with Ellerth's blunt statement that "[t]he general rule is that sexual harassment by a supervisor is not conduct within the scope of employment." Ellerth, 118 S. Ct. at 2267. We could, of course, understand this as a factual prediction, particularly given the variety of cases discussed--and not completely reconciled--in the two opinions. See id. at 2266-67; Faragher, 118 S. Ct. at 2286-87. But we also consider this statement in light of Faragher's cogent explanation that "scope of employment" is ultimately a question of law, not fact, expressing a court's conclusion that it is appropriate to hold an employer liable for its agents' acts in a particular case. See Faragher, 118 S. Ct. at 2287-88.

In Faragher itself, supervisors, in the course of carrying out their supervisory duties, repeatedly subjected female lifeguards to uninvited and offensive touching and to lewd and discriminatory remarks. See id. at 2280. The Court rejected the argument that harassment is a risk that employers should fairly be required to bear as a cost of doing business and that this kind of harassment should therefore be treated as falling within the scope of employment. See id. at 2288-89. Instead, the Court found that it would be preferable as a matter of social policy to apply the aided by the agency relation test to the facts of that case. See id. at 2292. In short, "scope of employment" is not a sharply delineated concept in law or logic, and that is what makes it so troublesome. We

18

employment remains an elusive concept, while the Supreme
Court has given us clearer instructions on how to
determine liability under the aided by the agency relation
standard. We are also mindful of the Supreme Court's
stated reason for formulating the affirmative defense, the
need to give employers incentives to establish anti-
harassment programs, see Ellerth, 118 S. Ct. at 2270, and
believe that too broad an interpretation of scope of
employment might make effective anti-harassment
programs irrelevant to employer liability in many hostile
environment cases, undermining the Court's intent.

However, we need not resolve the almost metaphysical
questions surrounding scope of employment today, for
under Ellerth and Faragher's aided by the agency relation
test, sex-based mistreatment by a supervisor--whether
overtly sexual or facially neutral and whether motivated by
lust or by dislike--creates automatic liability when it rises
to the level of a tangible adverse employment action. The
Court squarely held that, when there is a tangible adverse
employment action or the employer fails to make out its
affirmative defense, it is fair and just to hold the employer
responsible for harassment. A supervisor can only take a
tangible adverse employment action because of the
authority delegated by the employer, see Ellerth, 118 S. Ct.
at 2269, and thus the employer is properly charged with
the consequences of that delegation.7 As we will now

_____

also note our belief that the aided by the agency relation test is
similarly
a product of legal and policy considerations, and the Court may yet have
occasion to revisit the issue to clarify the remaining questions.

7. Concomitantly, we observe that, if the employer does not prove that it
exercised due care and that the employee's failure to use its safeguards
was unreasonable, the harassment can fairly be said to have been
facilitated by the power delegated to the supervisor, and thus aided by
the agency relationship. Conversely, if there is no tangible adverse
employment action and the employer does prove due care and
unreasonable employee behavior, the employer's anti-harassment efforts
and the opportunities for redress it offered a harassed employee will
generally justify the conclusion that the employer should not be required
to bear the costs of supervisory harassment. That is, the aided by the
agency relation standard seems to us to reflect a value judgment, not a

19

explain, Evans suffered tangible adverse employment action. Hence we find that the evidence here easily satisfies the Ellerth/Faragher aided by the agency relation test.8

B. Tangible Adverse Employment Action

The Supreme Court has defined a tangible employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 118 S. Ct. at 2268. According to Durham, none of the behavior described by Evans constitutes a tangible adverse employment action, and thus it is entitled to prevail on its affirmative defense. Forcing Evans to vacate her office is not tangible, Durham posits, because no other agent had a private office, and because she kept the office until she resigned.

We disagree. First, the District Court found, and Durham does not dispute, that a secretary and a private office were specific, negotiated conditions of Evans's move to Durham/Peoples. Evans also testified that, given the way she dealt with her accounts, a secretary was necessary to enable her to work successfully. Durham entirely ignores the loss of Evans's secretary, who was paid $20,000 per year--hardly a small sum. Given Evans's need for office

---

natural category, balancing the employer's right to be free from automatic liability against employees' right to a workplace that discourages and redresses harassment. See Faragher, 118 S. Ct. at 2291. Thus, for actionable harassment that occurs without any tangible employment action, the aided by the agency relation test may be tantamount to the failure of the employer's affirmative defense, which forms the contours of the liability test. The affirmative defense remains a defense and not an element of the plaintiff's case because the burdens of production and proof remain at all times on the employer, but the liability test as a whole is expressly designed to encourage effective anti-
harassment policies.

8. There are other bases for liability that are not relevant to our decision
today: cases in which the harasser's high rank makes him the employer's alter ego; cases in which the employer intended the harasser's conduct; cases in which the employee reasonably, but wrongly, believes that the harasser is a supervisor; and cases in which the employer is negligent. See Ellerth, 118 S. Ct. at 2267.

20

support to sustain her successful way of doing her whole life insurance business, depriving her of a secretary and an office could constitute a tangible adverse action even if none of the other agents had negotiated for those benefits. Cf. Marzano v. Computer Science Corp., 91 F.3d 497, 510–11 (3d Cir. 1996) (rejecting the claim that the uniqueness of an employee's position created an extra burden on the plaintiff to prove discrimination). Finally, Evans resigned when her office was stripped from her and her files went missing. The fact that she kept the office until she quit does not make the deprivation of the office meaningless. Under Durham's theory, any substantial adverse action, such as a demotion in authority and pay, would not be a tangible adverse employment action if it led the affected employee to quit before the demotion took effect. This is contrary to Title VII doctrine, which recognizes a constructive discharge under such circumstances. See Goss v. Exxon Office Sys. Co., 747 F.2d 885 (3d Cir. 1984).

Durham also asserts that Evans's missing files cannot be an adverse employment action. The District Court, by contrast, found that it was impossible for Evans to work without her files. If the files were vital to her work, the District Court could find that their disappearance under suspicious circumstances was a tangible adverse employment action.9 Although direct economic harm is an important indicator of a tangible adverse employment action, it is not the sine qua non. If an employer's act substantially decreases an employee's earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found. See Booker v. Budget Rent–a–Car Sys., 17 F. Supp. 2d 735 (M.D. Tenn. 1998).

_____

9. After Evans left, Heyman had possession of money orders and cash that he could only have gotten from Evans's files. In view of the other evidence in the case, Durham's control over thefiles would support the conclusion that their disappearance was evidence of discrimination. Cf. Aman, 85 F.3d at 1083 (missing time cards, false accusations of wrongdoing, and others' refusal to cooperate with the plaintiff in doing her job helped prove discrimination); Andrews, 895 F.2d at 1473 (unexplained loss of files was an important element of the plaintiffs' harassment claims).

21

Durham further contends that Evans's alleged harassers had no control over giving her lapsed books of business. Durham states that male agents also had to take lapsed books and that Evans ultimately received "lapse relief," which meant that her pay was not decreased as much as the normal rules would have mandated based on her large number of lapsed policies. In addition, Evans had the highest guaranteed salary in the agency. As a result, Durham argues, the lapse assignments did not constitute tangible adverse action. The record suggests, however, that lapse assignments came from one or two levels above Evans --that is, precisely the levels at which she argues the managerial staff was biased against her. The record also supports Evans's contention that she was assigned more lapsed policies than other (male) agents, so that she was treated less favorably than others. As a result of the lapse assignments, her earnings were cut almost in half. A decrease of that magnitude is surely significant enough to be a tangible adverse action.10 We conclude that the loss of Evans's office, the dismissal of her secretary, the missing files, and the lapse assignments that led to afifty percent pay decrease are tangible adverse employment actions under Ellerth and Faragher.

On its face, this conclusion would appear to preclude any affirmative defense for Durham. Yet Durham makes an interesting claim: It contends that the first time someone made a discriminatory remark to Evans, she ought to have reported it, using the sexual harassment policy. At that time, there was as yet no tangible adverse action against her. Durham asserts that, if Evans had reported the harassment at that point, it would have investigated and stopped the problem, and that it should therefore prevail on its affirmative defense. However, we decline to investigate

_____

10. Evans hotly disputed the claim that she was offered lapse relief, and the district judge was entitled to credit her testimony. Evans's high guaranteed salary is also less relevant than Durham claims. Most of her earnings were expected to come from commissions; from the testimony, it seems that no one expected agents to subsist on the salary guarantee. Moreover, the guarantee seems to have been a result of the negotiations that brought her to Durham/Peoples, before the management changed and those who ultimately harassed her assumed positions of power.

22

whether, if Evans had complained early on, the sexual harassment policy at Durham would have prevented the tangible adverse actions that occurred afterwards. The difficulty of making such a counterfactual inquiry counsels against injecting this question into already-complex discrimination cases, particularly at the appellate level with a closed record. While we need not decide the question now, we are fearful that, were we to allow an affirmative defense every time an employer could argue that the plaintiff had some non-tangible notice of discrimination before adverse action was taken against her, the Ellerth/Faragher distinction between cases with tangible adverse action and cases without such action would become hopelessly confused.

We note in this regard that it seems untoward to give an employer whose supervisors first signal their bias and then act on it more protection than an employer whose supervisors begin with tangible adverse action. This is particularly true because the plaintiff's evidence that adverse action was sex-based will often include evidence of prior discriminatory behavior; Durham's proposed standard would have the perverse effect of putting a greater burden on plaintiffs who had extensive evidence of discrimination. It would also make the affirmative defense applicable in quid pro quo cases, since threats generally are made before they are acted upon and put their recipients on notice of what is coming next. Yet that is exactly the opposite of the holding of Ellerth. The Ellerth/Faragher rule is clear: When harassment becomes adverse employment action, the employer loses the affirmative defense, even if it might have been available before. See Faragher, 118 S. Ct. at 2293 ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action . . . ." (emphasis added)); Ellerth, 118 S. Ct. at 2270 (same); id. at 2269 ("When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation. . . . Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate."). If there is some scenario

23

that will permit such a legal strategem, it does not appear in this case.

## 1. Supervisory Authority

Durham contests the District Court's finding that McKaskill was Evans's supervisor. If he was not a supervisor, his acts cannot subject Durham to automatic liability. Although we think that the other evidence of harassment is sufficient to hold Durham liable, we reject Durham's interpretation of McKaskill's supervisory authority. The District Court could reasonably have relied on witnesses, including McKaskill, who testified that McKaskill was part of the ruling "triumvirate" in Evans's office. As an associate Customer Service Unit Leader, he was two levels above Evans according to Durham's own chart. He was part of the three-person team that decided to get Evans's direct supervisor to strip her office from her and to instigate Durham's lawsuit against her. In general, complete authority to act on the employer's behalf without the agreement of others is not necessary to meet Title VII's agency standard for supervisor liability. See Bonenberger v. Plymouth Township, 132 F.3d 20, 23 (3d Cir. 1997). That McKaskill might not have had the authority to act alone did not mean that he was without supervisory authority over Evans.

## C. Pervasiveness and Severity of the Harassment

Durham next claims that, as a matter of law, the incidents described by Evans do not rise to the level of severity and pervasiveness needed to find a hostile environment. Durham characterizes the events to which Evans testified as "sporadic misbehavior." However, it is settled law that courts should not consider each incident of harassment in isolation. See Andrews, 895 F.2d at 1484. Rather, a court must evaluate the sum total of abuse over time. Evans has done more than identify isolated incidents of what Durham characterizes as "horseplay." She has also testified to discriminatory statements and actions that the court found to be sex-based. As a whole, the facts support the District Court's finding of a hostile work environment.

Durham also claims that most of the conduct of which Evans complains occurred after her employment ended and

24

thus cannot sustain a hostile work environment claim. We understand the District Court to have found that harassment took place on the basis of Evans's sex, both before and after she left Durham. See Durham Life Ins. Co. v. Evans, Nos. 94–801 & 95–2681, slip. op. at 16 (E.D. Pa. Aug. 4, 1997) ("The intimidation and harassment did not end with her resignation."). At all events, the sexual misconduct, sexist remarks, loss of Evans's negotiated privileges, and other events that took place before Evans left Durham are themselves sufficient to sustain a hostile work environment claim. Taken as a whole, the District Court's findings indicate an environment that rises to the level of pervasiveness and severity required tofind a hostile work environment. The post-employment actions are also significant; we address them infra Subsection IV.A.3.

IV. Back Pay

A. Evans's Entitlement to Back Pay

Title VII allows back pay awards when an employee does not leave her employment voluntarily. In this case, Evans must establish that she did not quit voluntarily; that is, that she was constructively discharged because a reasonable person would have found her working conditions intolerable. Durham contends that any actionable harassment occurred five to seven months before Evans left and thus that Evans deserves no back pay. The District Court found otherwise. According to itsfindings, the disappearance of Evans's files and the deprivation of her office right before she left constituted the culmination of a series of harassing events, making a formerly unpleasant job unbearable.

Durham argues that Evans was not constructively discharged when she was forced to follow an office policy forbidding agents from having their own offices, the event that precipitated her departure. We disagree, for essentially the same reasons that we conclude that Evans suffered adverse employment action. Constructive discharge exists if "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes

25

would resign." Goss, 747 F.2d at 887–88. Goss found that a reassignment to a less lucrative territory could constitute a constructive discharge, based on the substantial pay cut involved and the employee's loss of confidence in herself and her employer. See id. at 888–89. The facts here are quite similar. Although there is no need for a "straw that broke the camel's back" when the discrimination has continued over an extended time, see Aman, 85 F.3d at 1084, the loss of Evans's office and files constituted a substantial worsening of her working conditions at Durham. The District Court found that she could hardly have continued work at all without her files and money orders. Thus, the facts as determined by the District Court support the conclusion that Evans was constructively discharged.

B. The Back Pay Calculation

Back pay calculations are reviewed for abuse of discretion. See Booker v. Taylor Milk Co., Inc., 64 F.3d 860, 867 (3d Cir. 1995). Back pay may be awarded even if an exact dollar calculation is impossible. See Christopher v. Stouder Mem'l Hosp., 936 F.2d 870, 880 (6th Cir. 1991). The court may estimate what a claimant's earnings would have been without discrimination, and uncertainties are resolved against a discriminating employer. See Wooldridge v. Marlene Indus. Corp., 875 F.2d 540, 549 (6th Cir. 1989); Taylor v. Central Penn. Drug & Alcohol Servs. Corp., 890 F. Supp. 360, 370 (M.D. Pa. 1995).

1. Evans's Base Salary

Durham argues that the District Court used the wrong base salary for Evans because it used Evans's 1992 salary even though she left in 1993. This meant the difference between $119,000 and $66,000, or $53,000 per year. Durham cites to other cases that used a plaintiff's salary on the last day of employment to calculate back pay, even though the harassment had preceded that last day. Durham's precedents are easily distinguishable, because they concern cases of harassment that did not have a tangible impact on plaintiffs' compensation. See, e.g., Virgo v. Riviera Beach Assoc., Ltd., 30 F.3d 1350 (11th Cir. 1994). If Durham's argument were to be accepted, then it would be

to a discriminator's advantage to increase its mistreatment from a hostile environment to a decrease in pay, so that any ultimate penalty would be minimized. Evans's attempts to deal with the discrimination without quitting, despite the negative effects on her salary, should not be held against her.

The District Court did not abuse its discretion when it used Evans's salary from 1992, the last full year before the discrimination began, as the benchmark. Because Evans's salary when she left was less than a nondiscriminatory salary would have been, it should not be used as the benchmark. See EEOC v. Delight Wholesale Co., 973 F.2d 664, 668, 670 (8th Cir. 1994); cf. Gunby v. Pennsylvania Elec. Co., 840 F.2d 1108, 1119 (3d Cir. 1988) (back pay should be the difference between actual wages and the wages the plaintiff would have earned absent discrimination). Evans consistently earned $90,000 per year in the last few years before she came to Durham, and she was a leading producer at Durham, earning $128,000 and then $119,000. It was reasonable to conclude that, but for the discrimination, Evans would have continued her outstanding performance. Cf. Goss, 747 F.2d at 889 (upholding the District Court's calculation of commissions lost through discrimination because the estimates were reasonably based on the plaintiff's past performance);11 Gallo, 779 F. Supp. at 808 (calculating back pay on a commission basis and taking into account plaintiff's demonstrated ability to get commissions).

2. Evans's Earnings at Paul Revere

According to Durham, Evans made $65,955 in 1993, of which she earned $15,000 at Paul Revere. At $5000 per month, this was more than the $4200 per month she made at Durham. Ordinarily, there is no entitlement to back pay

_____

11. Goss is particularly apposite, because in that case, as here, the employer was undergoing some turmoil that arguably exerted downward pressure on everyone's commissions. Exxon objected to the District Court's choice of a base year because, it argued, that year was not representative of the new order. See Goss, 747 F.2d at 889. The court rejected Exxon's claim because the wrongdoer should bear the risk of uncertainty, not the victim. See id.

when the claimant makes more money at another job than she could have made at her former job. Durham suggests that Evans is therefore not entitled to any back pay.

There are two reasons that Durham's claim fails. First, because we find that the District Court did not abuse its discretion when it chose 1992 as the benchmark year, it follows that Evans was earning almost $10,000 per month in the absence of discrimination, and so she did not get a "better-paying" job for back pay purposes. Second, Evans's success at Paul Revere was short-lived, and ended in February 1994. After that, she made substantially less per month, and it would be both unfair and illogical--in the absence of a finding that she unreasonably failed to mitigate her damages--to reduce her award by the sums that Durham projects that she could have earned. Significantly, the court found that her decline was caused by Durham's actions against her, which ultimately led her to take disability leave from Paul Revere. Because Durham's conduct affirmatively impaired her ability to mitigate her damages, it would be inequitable to reduce her back pay award in this case.

3. Durham's Post-employment Actions Against Evans

Anticipating this response to Durham's back pay argument, Durham contends that there is no support in the record for the proposition that adverse actions against Evans after her employment ended justify continuing the back pay award. In particular, Durham notes that there are no findings that it retaliated against Evans for engaging in a protected activity.

The District Court apparently did not discuss retaliation because it treated the post-employment actions as continuing discrimination. Post-employment actions by an employer can constitute discrimination under Title VII if they hurt a plaintiff's employment prospects. See Passer v. American Chem. Soc'y, 935 F.2d 322, 331 (D.C. Cir. 1991) (ADEA case); London v. Coopers & Lybrand, 644 F.2d 811, 816 (9th Cir. 1981); Shehadeh v. Chesapeake & Potomac Tel. Co., 595 F.2d 711, 719-21 (D.C. Cir. 1978); Daley v. St. Agnes Hosp., Inc., 490 F. Supp. 1309, 1313 (E.D. Pa. 1980). The lawsuit against Evans and the complaints to the

Insurance Department had the potential to affect her ability to sell insurance, and the District Court found that she was powerfully affected because of the anxiety created by the investigation. This kind of threat to Evans's livelihood is sufficiently employment-related to be an employment action. See Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 198 (3rd Cir. 1994) (post-employment threat to a teacher's license constituted employment action). The conclusion that the post-employment actions were a continuation of the initial discrimination seems plausible in light of the finding that, during her employment with Durham, her agency manager impliedly threatened to file a lawsuit against Evans if she were to quit after the discrimination began. Furthermore, Durham's conduct in filing suit against Evans for replacing sixteen policies while ignoring the conduct of a man who transferred 170 policies could support the inference that the lawsuit was filed for discriminatory, not simply retaliatory, reasons.

Evans further argues that the evidence would support upholding the District Court on a claim of post-employment retaliatory conduct. Title VII prohibits retaliation against employees who engage in a protected activity such as stating a claim of discrimination (as Evans did in her resignation letter) and filing suit. See 42 U.S.C. S 2000e-3(a). We agree that the facts found by the District Court would support a retaliation claim. Durham, citing Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983), responds that filing a lawsuit against Evans for breach of her non-competition agreement cannot form the basis of a retaliation claim unless the lawsuit lacked a reasonable basis because of Durham's First Amendment right to take disputes to the courts. Bill Johnson's, however, construed a specific, ambiguous provision of the NLRA defining unfair labor practices. Its reasoning has not been extended to Title VII, in part because the prohibition on retaliation is so explicit and the public policy behind the retaliation provision so compelling.

In addition, Durham took other post-employment actions besides filing the lawsuit against Evans, and we need not rely on the lawsuit to find retaliatory conduct. John Heyman, an agency manager, failed to conduct a full audit

29

of Evans's accounts, contrary to industry custom and to Durham's own policies. Because Evans's accounts were left up in the air, policyholders made inquiries that ultimately became complaints when payments that should have been prepaid were not made.

Durham states that the "evidence is clear" that the complaint letters about Evans came from policyholders and were not solicited by Durham. Yet the evidence supports the conclusion that it was Durham's unusual inaction that set the entire process in motion. Rather than acting in its own self-interest and keeping Evans's former clients satisfied with their Durham policies, the record shows that Durham allowed record-keeping problems to escalate into complaints. Durham also sent letters to all of Evans's clients that arguably encouraged such complaints. The complaints only targeted Evans despite the concurrent involvement of a man in 75% of the relevant cases. 12

Most importantly, as a result of the complaints, the Pennsylvania Insurance Department investigated Evans. Durham contends that the investigation occurred without Durham's urging. But that is a disputed issue and, at all events, it could be inferred that the investigation would not have happened but for Durham's arguably discriminatory failure to audit Evans's accounts properly. In addition, unprompted by the Insurance Department, Heyman sent it information mistakenly indicating that Evans had committed a serious offense. Evans testified to the seriousness of the resulting charges and the negative effects this series of events had on her ability to continue her insurance work.

These facts resemble those in other cases in which courts have found retaliation when an employer instigates

_____

12. Heyman and others testified that they refused to return phone calls when anyone called to ask about Evans's policies after she left. Durham apparently reads this testimony to suggest that its employees did not instigate any complaints. After the somewhat disturbing letter they sent to Evans's former customers, however, policyholders might well be more likely to write out a complaint, and to name the only person whose name they knew, at least if no one else at the insurance company would answer questions about the policies.

30

government action against a former employee. See Berry v. Stevinson Chevrolet, 74 F.3d 980, 985 (10th Cir. 1996) (encouraging a person to report the suspected crime of a former employee can be retaliation); Beckham v. Grand Affair, Inc., 671 F. Supp. 415, 419 (W.D.N.C. 1987) (reporting a former employee for criminal trespass can be actionable retaliation); see also EEOC v. Virginia Carolina Veneer Corp., 495 F. Supp. 775, 777 (W.D. Va. 1980) (filing a state law defamation claim against an ex-employee is impermissible retaliation), appeal dismissed, 652 F.2d 380 (4th Cir. 1981). These cases reasoned that such instigation could constitute a retaliatory adverse employment action because government investigation can hurt a person's employment prospects. The same reasoning would support a finding that post-employment attempts to get a person investigated can be employment discrimination. Cf. Charlton, 25 F.3d at 198 (suggesting that post-employment action might sustain a claim of discrimination as well as of retaliation).

In sum, we conclude that Durham's post-employment acts against Evans at the very least prevent Durham from arguing that Evans unreasonably failed to mitigate her damages, which is the only way Durham could avoid a back pay award under these circumstances.13

---

13. Evans argues that the District Court erred by miscomputing her back pay. Durham responds that she should have made a post-trial motion to correct the judgment under Fed. R. Civ. P. 52(b). Rule 59(e) would be more appropriate, as Rule 52(b) concernsfindings and their effects on the judgment rather than errors in the judgment alone, but the general point is well taken. See Perez v. Cucci, 932 F.2d 1058, 1059 (3d Cir. 1991) (Rule 59(e) should be used to challenge inclusion of back pay award). The miscomputation alleged is a bit confusing, since Evans argues that the court attributed too much to her in employer matching pension funds and then too little in lost compensation, resulting in a figure that was in total too low. It is not clear how she derived this calculation, because the District Court's award does not set forth amounts for specific categories of loss. This does not seem to be a clerical mistake, which would be correctable under Rule 60(a). Back pay is within the discretion of the District Court, and we do not have reason to conclude that the District Court abused its discretion.

31

V. The Collective Bargaining Agreement and the
Covenant Not To Compete

Durham appeals the dismissal of its claim against Evans
for breach of her noncompetition agreement, which was
part of her employment contract under the former collective
bargaining agreement. Durham also contends that the
agreement required Evans to pursue a grievance rather
than litigating her harassment complaint as a counterclaim
in the lawsuit against her. We reject these arguments
because they are contradicted by the District Court's fact
findings, which are not clearly erroneous.

A. The Covenant Not To Compete

The District Court found that Biancardi, the regional vice
president who was handling the negotiations with the
union, told Evans and others that the covenant not to
compete was abrogated and that the union contract, which
had incorporated the noncompetition covenant, was not in
effect. This finding was not clearly erroneous. The District
Court further concluded that Biancardi, as a regional vice
president and an official negotiator with the union, had
authority to bind Durham by his statement. Evans was
entitled to rely on his representation that the covenant no
longer bound her. Although Durham argues that the
collective bargaining agreement (CBA) was in effect, it does
not contest this latter finding. Given Biancardi's position of
authority, we agree with the District Court that Durham
was estopped from enforcing the covenant not to compete
against Evans.

B. Grievance Under the Collective Bargaining Agreement

Durham argues that the CBA remained mostly in effect
during the new contract negotiations. Even though the CBA
had formally expired, Durham avers, Evans was required to
grieve instead of filing suit because both the company and
the union treated the CBA as if it were still in effect. The
District Court found that the CBA had been abrogated
when Durham unilaterally decreased agents' compensation.
Durham argues that the union acceded to the change and
suggests that, if the District Court had been correct, the
union certainly would have filed an unfair labor practice

charge.[14] There are many reasons the union might not file a charge or grievance it was legally entitled tofile; in the midst of the upheaval caused by Durham's management changes, the union might have preferred to attempt to resolve disputes amicably. The important point is that the District Court did not clearly err when it found that the compensation was not changed by mutual agreement, even though the union ultimately acquiesced.

We are also satisfied that the District Court did not clearly err in finding that Biancardi had the authority to bind Durham when he told Evans that the CBA was no longer effective. Employer repudiation generally estops an

_____

14. Paradoxically, this seems to be a concession that the arbitration clause was no longer in effect, since only then would an unfair labor practice charge be the appropriate remedy for a compensation change. Under Litton Financial Printing Div. v. NLRB, 501 U.S. 190 (1991), an arbitration clause does not generally continue in effect after a CBA expires. If the employer makes a unilateral change in benefits instead of bargaining, a union must generally file an unfair labor practice charge rather than arbitrating. The issue is complicated by Luden's Inc. v. Local Union No. 6, 28 F.3d 347, 355-56 (3d Cir. 1994), not cited by the parties. Under Luden's, an arbitration clause in a lapsed CBA will continue in effect until one side clearly indicates through words or conduct that it no longer wishes to be bound. The termination of the CBA does not generally signal an intent to abandon arbitration, and discontent with other aspects of the CBA (such as compensation provisions) does not mean that an arbitration obligation ends when the CBA terminates. See id. at 356. Biancardi's acts take this case out of the ambit of Luden's. We also point out, although the parties have not done so, that it is not clear that the CBA, even if it remained in effect, would require Evans to grieve instead of filing suit. See Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974). Alexander has been limited by Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991), but that decision did not address the situation in which a CBA, negotiated to enforce collective rights, requires arbitration; it concerned an agreement directly between employer and employee limiting individual statutory rights. See Nieves v. Individualized Shirts, 961 F. Supp. 782, 790-92 (D.N.J. 1997). The Supreme Court recently declined to decide whether an explicit waiver of federal statutory rights could be enforced, see Wright v. Universal Maritime Serv. Corp., 119 S. Ct. 391 (1998), and, as we resolve the arbitration issue on other grounds, we decline to address the issue today, especially as the parties have devoted no argument to the law in this area.

employer from claiming that a plaintiff should have grieved first. See Hendricks v. Edgewater Steel Co., 898 F.2d 385, 388 (3d Cir. 1990); Garcia v. Eidal Int'l Corp., 808 F.2d 717, 722 (10th Cir. 1986) (where, as company ownership was changing, the new company did not explicitly repudiate arbitration but did indicate that the contract no longer existed, an inference of repudiation was justified); Kaylor v. Crown Zellerbach, Inc., 643 F.2d 1362, 1366 (9th Cir. 1981) (company's lawyer denied that company was bound by CBA; company was estopped from demanding that plaintiffs grieve before litigating); Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 975-76 (3d Cir. 1972) (when the employer first stated that it was working under the old contract and then said no contract existed, it had repudiated the contract and grievance was not required).

VI. Intentional Infliction of Emotional Distress

Durham argues that the $100,000 awarded for intentional infliction of emotional distress ("IIED") is preempted by Pennsylvania worker's compensation law, which provides that worker's compensation is the exclusive remedy for injuries arising in the course of a worker's employment. See 77 Pa. Cons. Stat. Ann. S 481(a). The worker's compensation law excepts from its preemptive scope employee injuries caused by the intentional conduct of third parties for reasons personal to the tortfeasor and not directed against him as an employee or because of his employment. See id. S 411(1). Cases interpreting Pennsylvania law are split on the propriety of allowing IIED claims for sexual harassment on the job. Courts have allowed such claims where the injury arose from harassment "personal in nature and not part of the proper employer-employee relationship." Hoy v. Angelone, 691 A.2d 476, 482 (Pa. Super. Ct. 1997), aff'd on other grounds, 720 A.2d 745 (Pa. 1998); see also Schweitzer v. Rockwell Int'l, 586 A.2d 383, 391 (Pa. Super. Ct. 1990) (harassment is personal and not part of the legitimate employer/employee relationship).

Other cases, however, have found preemption in similar circumstances. See, e.g., Hicks v. Arthur, 843 F. Supp. 949, 958 (E.D. Pa. 1994) (harassment of a group of black

34

employees did not stem from "personal animosity" and any black would have been discriminated against, so IIED was preempted). In Winterberg v. Transportation Insurance Co., 72 F.3d 318 (3d Cir. 1995), we concluded that egregious misbehavior in handling a worker's compensation claim was preempted because the Pennsylvania law has a broad intent to preempt common law torts "in matters arguably connected with work-related injuries." Id. at 322. The attempt to harm Evans, a "successful woman," was arguably directed at Evans as an employee, since it stemmed from Evans's success at Durham.15

Evans responds that her IIED claim is not preempted because many of the acts she found so devastating occurred after she left Durham. The District Court considered this quite relevant. Claims for damages arising from post-employment conduct have been found not to be preempted by workers' compensation laws in other jurisdictions.16 We are not convinced, however, that the

_____

15. We thus suspect that a claim of Evans's sort would be preempted. We understand Pennsylvania law to extend worker's compensation preemption to personal animosity that develops from work-related events. See Hammerstein v. Lindsay, 655 A.2d 597, 601 (Pa. Super. Ct. 1995) (where animosity develops because of work-related disputes, worker's compensation is the exclusive remedy); Shaffer v. Procter & Gamble, 604 A.2d 289 (Pa. Super. Ct. 1992) (where an employee was injured on the job and wrongfully denied treatment, IIED was preempted because it could have happened to any employee who got injured); cf. Konstantopoulos v. Westvaco Co., 112 F.3d 710, 723 (3d Cir. 1997) (discussing the Delaware Supreme Court's determination that similar IIED suits are preempted under Delaware worker's compensation law). Sexual harassment is a well-recognized workplace problem, the kind of thing employers must be prepared to combat. Because it is like other workplace hazards, we suspect that Pennsylvania would find IIED claims based on this kind of harassment to be preempted. But we cannot be sure, and we express no opinion as to whether an IIED claim for harassment more disconnected from the work situation would be preempted, for example where a supervisor sexually assaulted an employee or stalked her outside of work. Ellerth and Faragher may also have an impact on this area of the law, as those cases to some degree render the distinction between employment-related and purely personal discriminatory motives irrelevant to employer liability.

16. See Caldwell v. Federal Express Corp., 908 F. Supp. 29, 33 (D. Me. 1995); Kroger Co. v. Willgruber, 920 S.W.2d 61, 64 (Ky. 1996); Cagle v.

35

post-employment actions in this case, distinguished from what went before, are sufficiently egregious on their own to rise to the level of IIED, although Durham did not raise this issue in its papers.

We need not rule on the sufficiency of the post-employment conduct, however, because we hold that the emotional distress award may be sustained under 42 U.S.C. S 1981a(b)(3), which authorizes compensatory damages under Title VII for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." The District Court's findings are adequate to meet the standard for recovery of damages for emotional harm under Title VII.17 At oral argument, counsel for Durham conceded as much. See Murray v. United of Omaha Life Ins. Co., 145 F.3d 143, 157 (3d Cir. 1998) (where the jury's implicit findings were consistent with the correct legal standard despite incorrect instruction, its verdict could be upheld on appeal). 18

Conclusion

For all the foregoing reasons, the judgment of the District Court will be affirmed. Costs shall be taxed against Appellant/Cross-Appellee Durham.

_____

Burns & Roe, Inc., 726 P.2d 434, 439 (Wash. 1986). But see Bertrand v. Quincy Market Cold Storage & Warehouse Co., 728 F.2d 568, 572 (1st Cir. 1984) (where most of the offensive conduct took place before employment ended, IIED was preempted under Massachusetts law); Ely v. Wal-Mart, Inc., 875 F. Supp. 1422, 1429 (C.D. Cal. 1995) (IIED for post-employment acts was preempted).

17. Although we are skeptical that the facts of this case are sufficiently egregious to establish IIED, see Hoy v. Angelone, 720 A.2d 745 (Pa. 1998), Durham does not contest the adequacy of Evans's claim on appeal, only its legal availability.

18. Evans also appeals the decision not to award punitive damages against Durham. This was not an abuse of the District Court's discretion and we will not overturn it on appeal. See East Coast Tender Serv. v. Robert T. Winzinger, Inc., 759 F.2d 280, 284 (3d Cir. 1985).

WEIS, Circuit Judge, concurring.

Relying on language in Burlington Industries, Inc. v. Ellerth, 118 S. Ct. 2257 (1998) and Faragher v. City of Boca Raton, 118 S. Ct. 2275 (1998), the majority concludes that because the harassing supervisors took adverse employment action, defendant Durham may not present a defense based on the plaintiff's failure to utilize the employer's grievance procedure.

The majority correctly observes that the Ellerth and Faragher opinions distinguish between situations in which tangible adverse employment action occurred and those in which it has not (i.e., a sexually hostile environment but no tangible adverse action). See Ellerth, 118 S. Ct. at 2270; Faragher, 118 S. Ct. at 2292-93. This distinction, used in the context of defining the scope and imposition of vicarious liability, is understandable and readily applied. The case before us, however, has elements of both a hostile environment claim and a claim for discriminatory adverse employment action and may appropriately be termed a "mixed" one. In these circumstances, it is insufficient simply to point to the distinction; Ellerth and Faragher compel discussion of other considerations.

Faragher emphasized that Title VII's primary objective "is not to provide redress, but to avoid harm." 118 S. Ct. at 2292 (citing Albemarle Paper Co. v. Moody, 422 U.S. 405, 417 (1975)). The Court observed that a defense structured to recognize the employer's affirmative obligations would implement clear statutory policy by rewarding employers who make reasonable efforts to discharge their duty and help prevent sexual harassment. See id. (discussing Title VII, and the regulations and policies of the Equal Employment Opportunity Commission).

Similar language appears in Ellerth. There, the Court reiterated that Title VII encourages the creation of anti-harassment policies and effective grievance procedures. See Ellerth, 118 S. Ct. at 2270. As the Court observed, "[w]ere employer liability to depend in part on an employer's effort to create such procedures, it would effect Congress' intention to promote conciliation rather than litigation in the Title VII context." Id. Moreover, "[t]o the extent limiting

37

employer liability could encourage employees to report harassing conduct before it becomes severe or pervasive, it would also serve Title VII's deterrent purpose." Id.

Both opinions also expressly endorse, as consistent with Title VII, a framework that places some onus on the victims of sexual harassment to report it to their employers. Ellerth recognized that "Title VII borrows from tort law the avoidable consequences doctrine." Id. (citing Ford Motor Co. v. EEOC, 458 U.S. 219, 232 n.15 (1982)). Faragher echoed this proposition: "[i]f the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so." 118 S. Ct. at 2292.

Affording employers an affirmative defense serves two purposes. First, it supports the imposition of vicarious liability when a supervisor subjects a subordinate to a hostile environment. Second, it prevents litigation by encouraging the creation of effective grievance procedures and the settlement of cases, as well as discouraging would-be plaintiffs who have failed to take advantage of preventive procedures.

Allowing the defense in hostile environment cases serves both purposes, but denying it in mixed cases defeats the second, arguably where the defense is most needed. Both types of harm could be avoided if employers created effective procedures and employees utilized them. In a case where tangible adverse actions could have been avoided had the plaintiff-victim reported the escalating pattern of harassment, preclusion of the defense lacks a logical foundation.

In this case, the plaintiff experienced harassment over a period of many months before any adverse employment action occurred. Without belaboring the details, it appears that the various harassing incidents occurred in March, April, May, June and July 1993. The tangible adverse employment actions discussed by the majority, however, occurred later: plaintiff's secretary was not discharged until July 1993 and the plaintiff did not lose her office or her files until September 1993.

Defendant Durham argues that had the plaintiff reported the harassing conduct that took place before July 1993, it would have had an opportunity to correct the situation and thereby forestall the later adverse actions taken by the plaintiff's superiors. Given Ellerth and Faragher's exposition of the rationale underlying the defense, that argument has some force. Unlike the majority, I do not discount that argument but believe that the employer has failed to establish a right to the defense on an entirely different ground.

I would affirm the judgment in this case because Durham did not show that its grievance procedure was adequate to satisfy the standards set out in Ellerth and Faragher. The District Court found that "Evans was never given any literature or provided any information about the procedure to report sexual harassment and had no idea where such information could be obtained." An effective employer policy, however, is one that has been disseminated to all employees and that provides an assurance that the harassing supervisor can be bypassed in registering a complaint. See Faragher, 118 S. Ct. at 2293. Durham's policy met neither of these requirements. Therefore, having failed to establish the most basic requirement for invocation of the affirmative defense, i.e., an effective grievance procedure, Durham was not entitled to its protection.

Because I join in all other portions of the majority opinion, I would affirm.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

39